MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:        2022 ME 50
Docket:          Ken-21-232
Argued:          March 8, 2022
Decided:         September 27, 2022

Panel:           STANFILL, C.J., and MEAD, JABAR, HORTON, and CONNORS, JJ., and HUMPHREY, A.R.J.[1]
Majority:        STANFILL, C.J., and MEAD, HORTON, and CONNORS, JJ., and HUMPHREY, A.R.J.
Dissent:         JABAR, J.

STATE OF MAINE

v.

TIMOTHY BARCLIFT

HORTON, J.

[¶1]  Timothy Barclift appeals from a judgment of conviction based on two merged counts of aggravated furnishing of cocaine (Class B), 17-A M.R.S. § 1105-C(1)(B)(1), (D) (2018),[2] entered by the trial court (Kennebec County, *Stokes, J.*) after a trial.  Barclift argues that the court erred when it denied his motion to suppress evidence obtained when police officers stopped him after receiving an anonymous tip and searched his belongings outside a bus station

---

[1] Although Justice Gorman participated in the appeal, she retired before this opinion was certified. Justice Humphrey sat at oral argument and participated in the initial conference while he was an Associate Justice and, as directed and assigned by the Chief Justice, is now participating in this appeal as an Active Retired Justice.

[2] Title 17-A M.R.S. § 1105-C(1)(D) has been amended since the time period relevant to this case. *See* P.L. 2021, ch. 396, § 5 (effective Oct. 18, 2021) (codified at 17-A M.R.S. § 1105-C(1)(D) (2022)). The amendment has no bearing on this appeal.

2

in Augusta. Because the record evidence regarding the anonymous tip and the subsequent efforts by police to confirm its reliability fails to establish an objectively reasonable, articulable suspicion sufficient to justify the stop, we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

[¶2]  In July 2020, a grand jury indicted Barclift on two counts of aggravated trafficking in cocaine (Class A), 17-A M.R.S. § 1105-A(1)(B)(1), (D) (2018).[3]  Barclift filed a motion to suppress evidence, on which the court held an evidentiary hearing.  In an order denying the motion, the court found the following facts, which, except as noted, are supported by competent evidence in the suppression record.  *See State v. Chan*, 2020 ME 91, ¶ 13, 236 A.3d 471.

[¶3] On January 9 and 10, 2020, the Augusta Police Department and the Maine Drug Enforcement Agency each received, through an online reporting system similar to email, a written anonymous communication containing a tip

---

[3]  The charges were based on alternative theories—in one, the State alleged that Barclift trafficked in cocaine in a quantity of 112 grams or more, *see* 17-A M.R.S. § 1105-A(1)(D) (2018); in the other, the State alleged that Barclift trafficked in cocaine and had previously been convicted in New York of "an offense relating to scheduled drugs and punishable by a term of imprisonment of more than one year," *see* 17-A M.R.S. § 1105-A(1)(B)(1) (2018).  Section 1105-A(1)(D) has been amended since the events leading to the charges, *see* P.L. 2021, ch. 396, § 4 (effective Oct. 18, 2021) (codified at 17-A M.R.S. § 1105-A(1)(D) (2022)), but the amendment has no effect on the issues presented here.

concerning Barclift.[4]  The two tips were nearly identical in content, suggesting that they were provided by the same person.  The tipster wrote that Barclift was a rap artist known as DownLeezy and that he traveled regularly from New York to Maine by Concord Trailways bus carrying large quantities of cocaine or heroin in a bag or a backpack,[5] and that he had been doing so for years.  The tipster also gave a date of birth for Barclift and indicated that he typically carried a firearm.

[¶4]  Through internet searches, police confirmed that Barclift was a rap artist known as DownLeezy.  From law enforcement authorities in New York, they obtained a photograph of Barclift and an indication that he had a criminal

---

[4] Neither of the actual messages containing the tip was made part of the suppression record.  The only evidence of the tip's content in the suppression record (and, therefore, within our scope of review) consists of witness testimony at the suppression hearing describing what was contained in the tip.  *See State v. Tribou*, 488 A.2d 472, 475 (Me. 1985) (stating that appellate review of the denial of a motion to suppress is limited to the evidence in the suppression hearing record); *State v. Annis*, 2018 ME 15, ¶ 16 n.3, 178 A.3d 467 ("Our review . . . is limited to the record before the suppression court at the time of its order . . . .").

Some of the court's findings concerning the anonymous tip's content went beyond the evidence admitted during the suppression hearing.  For example, although the court found that the date of birth that the tipster provided "was inaccurate by a few days," the suppression record contains no evidence of either the specific date of birth that the tipster provided or Barclift's actual date of birth.  The court also found that the tipster indicated that Barclift traveled to "Brunswick and Augusta," but there is no evidence in the suppression record that the tipster described any destination more specific than "Maine" or "the area."  The court also found that "the tipster stated that Barclift stayed in Maine for just a few days, then returned to New York, and then would come back to Maine with more drugs," but there is no evidence in the suppression record that the tipster provided information about the duration of Barclift's stays in Maine.

[5] One of the two witnesses who testified at the suppression hearing on this point testified that the tipster indicated that Barclift carried drugs "[i]n a backpack or a bag."  The other testified that the tipster indicated that Barclift used "a bag."

4

history of indeterminate vintage.[6]  They also contacted an employee of Concord Trailways in Boston, who said that Barclift had purchased ten bus tickets to Maine in the month of January 2020, made four trips to Maine within the first nine days of January 2020, and purchased bus tickets for travel to Maine since 2014.[7]  The employee also told police that Barclift used cash to pay for his bus tickets.[8]

[¶5] On January 22, 2020, the Concord Trailways employee reported that Barclift had purchased a bus ticket for travel to Augusta that afternoon and described the clothing that Barclift was wearing.  A team of police officers set up surveillance at the Concord Trailways bus terminal in Augusta.  The bus arrived and passengers, including Barclift, got off.  Barclift was wearing a backpack and carrying a black plastic bag.  He exited the terminal building,

[6] The suppression record is vague in terms of what the police learned about Barclift's criminal history.  One officer testified that he understood that Barclift had "a criminal history in New York for a narcotics violation."  He testified that he "believed" that "there was a robbery at one point," and he answered in the affirmative to a question about whether Barclift had "transported narcotics" and "had a prior conviction for a violent crime."  Another officer testified that Barclift had "some prior criminal history."  However, the only specific evidence of Barclift's criminal history in the record of the case is the parties' stipulation during trial that he had a 1994 drug conviction in New York.

[7] The dissent lists "a recent purchase of tickets" as a "corroborated" aspect of the tip, Dissenting Opinion ¶ 34, but the trial court did not find that the tip itself provided information about a recent ticket purchase and there is no evidence in the suppression record that would support such a finding.

[8] Two State's witnesses testified, however, that the bus line employee reported that Barclift purchased the tickets using his own name, contrary to the tipster's assertion that Barclift used a false name to purchase bus tickets.

approached a waiting SUV, put his backpack and bag in the back seat area, and started getting into the front passenger seat. Multiple police officers and vehicles converged on the SUV, Barclift got out with his hands raised in the air, and an officer immediately placed him in handcuffs. Eventually, officers searched Barclift's backpack, found a plastic bag containing approximately 300 grams of cocaine, and placed him under arrest.

[¶6] After the suppression hearing, the court concluded that the police officers had an objectively reasonable, articulable suspicion that Barclift had been engaged in criminal activity when they stopped him on the afternoon of January 22, 2020, and issued a written order denying the motion to suppress the physical evidence seized as a result of the stop.[9]

[¶7] During a two-day trial, the court instructed the jury to consider aggravated furnishing of cocaine, *see* 17-A M.R.S. § 1105-C(1)(B)(1), (D), as a lesser-included offense if it found Barclift not guilty of aggravated trafficking. The jury found Barclift not guilty of aggravated trafficking but guilty of aggravated furnishing because of the quantity of drugs furnished, and the court

---

[9] The court granted a portion of Barclift's motion in which he sought exclusion of statements that he made at the police station without having received *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

6

found him guilty of aggravated furnishing because of a prior conviction.[10] The court merged the two charges for sentencing, *see State v. Armstrong*, 2020 ME 97, ¶ 11, 237 A.3d 185, imposed a sentence, and entered a judgment on the verdicts. Barclift timely appeals from the judgment. *See* 15 M.R.S. § 2115 (2022); M.R. App. P. 2B(b)(1).

## II. DISCUSSION

[¶8] Barclift's central argument is that the court erred when it denied his motion to suppress because the police lacked a sufficient basis for the stop under the Fourth Amendment to the United States Constitution.[11] *See* U.S. Const. amend. IV. The Fourth Amendment's protection against "unreasonable" searches and seizures by the government, *id.*, "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest," *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Here, the stop essentially began as a temporary seizure of Barclift's person because the police blocked in the vehicle

---

[10] Barclift had proceeded with a jury-waived trial on the charges that alleged a prior conviction. *See* 17-A M.R.S. §§ 1105-A(1)(B)(1), 1105-C(1)(B)(1) (2018). He stipulated that he had been convicted in 1994 of "Criminal Sale Controlled Substance-3rd: Narcotic Drug" in New York.

[11] He also argues, as an alternative ground for relief on appeal, that the court did not require the State to prove that information contributing to probable cause to search his backpack was not the fruit of an earlier illegal search. Because we conclude that the police did not have sufficient grounds to make the initial stop, we need not address that argument.

Although Barclift included a passing reference to the Maine Constitution in the motion to suppress that he filed in the trial court, on appeal he has raised no independent argument specific to the Maine Constitution. *See State v. Chan*, 2020 ME 91, ¶ 18 n.10, 236 A.3d 471.

that he was entering and approached him from multiple directions with guns drawn. To satisfy the requirement that such a stop not be unreasonable, an officer must, at the time of the stop, have "an articulable suspicion that criminal conduct has taken place, is occurring, or imminently will occur." *State v. Lafond*, 2002 ME 124, ¶ 6, 802 A.2d 425 (quotation marks omitted). Moreover, "the officer's assessment of the existence of specific and articulable facts sufficient to warrant the stop [must be] objectively reasonable in the totality of the circumstances." *Id.* (quotation marks omitted). "Reasonable articulable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, but the suspicion needs to be based on more than speculation or an unsubstantiated hunch." *State v. McDonald*, 2010 ME 102, ¶ 6, 6 A.3d 283 (alteration and quotation marks omitted); *see Arvizu*, 534 U.S. at 274 ("[A]n officer's reliance on a mere 'hunch' is insufficient to justify a stop . . . ." (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968))).

[¶9] Our review of the denial of a motion to suppress is limited to the record on which the court made its ruling. *State v. Tribou*, 488 A.2d 472, 475 (Me. 1985) ("Only evidence presented to the motion Justice is considered in deciding whether the record supports the motion Justice's determination."). We evaluate the court's factual findings for clear error and its legal conclusions

8

de novo. *State v. Fleming*, 2020 ME 120, ¶ 25, 239 A.3d 648. Where, as here, the historical facts are undisputed, we "assess the officer's suspicion de novo," *Lafond*, 2002 ME 124, ¶ 6, 802 A.2d 425, because "[w]hether an officer's suspicion is objectively reasonable is a pure question of law," *State v. Sylvain*, 2003 ME 5, ¶ 11, 814 A.2d 984; *see Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[D]eterminations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.").

A.     **Reasonable Articulable Suspicion and Anonymous Tips**

[¶10]   When an investigatory stop is based on information from an informant, "the central issue . . . is whether the informant's information is so reliable and complete that it makes past, present or pending criminal conduct sufficiently likely to justify a stopping of the designated person for investigation." 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.5(i) (6th ed. 2020). In a line of fact-dependent benchmark cases, the United States Supreme Court has also developed the analysis for the constitutionality of investigatory stops that are based on information provided by an anonymous informer.

[¶11]   First, in *Adams v. Williams*, the Supreme Court made clear that reasonable suspicion for a stop can arise from information other than a police

officer's personal observations where the information has sufficient "indicia of reliability." 407 U.S. 143, 147 (1972). There, a police officer stopped a person based on a contemporaneous but unverified tip given in person by a known informant at 2:15 a.m. in a "high-crime area." *Id.* at 144-45. Concluding that the resulting stop was not an unreasonable seizure under the Fourth Amendment, the Court focused on the facts that the informant "was known to [the officer] personally and had provided him with information in the past" and that the informant would have been subject to arrest and prosecution for falsely reporting a crime. *Id.* at 146-47. The Court noted that the case before it was, for those reasons, stronger than one involving an anonymous tip. *Id.*

[¶12]   In *Illinois v. Gates*, a case involving an anonymous tip in the probable cause context, the Court adopted a totality-of-the-circumstances test for probable cause but made clear that the factors central to its previous test—the tipster's "veracity," "reliability," and "basis of knowledge"—remained "highly relevant." 462 U.S. 213, 225, 230-32, 238 (1983) (quotation marks omitted). The Court stressed that the totality-of-the-circumstances test "permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." *Id.* at 234. The Court held that probable cause existed because police had corroborated "major

portions of the [tip]'s predictions," including its "range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 245-46.

[¶13]  Next, in *Alabama v. White*, the Court drew on *Adams* and *Gates* to examine whether an anonymous telephone tip, "as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop."  496 U.S. 325, 326-27 (1990).  In *White*, the anonymous telephone caller told police that Vanessa White would be leaving a specific residence at a specific time on a specific date and would be traveling to a specific motel with a specific quantity of an illegal drug in a specifically described container.  *Id.* at 327.  The police went to the residence that the tipster had identified, saw White enter a vehicle matching the tipster's description at the indicated time, and followed the vehicle as it proceeded on "the most direct route" toward the named motel.  *Id.*  The stop occurred just short of the motel.  *Id.*

[¶14]  Distinguishing anonymous tips from those provided by known informants, the Court first stated that an anonymous tip, standing alone, is highly unlikely to demonstrate the informant's basis of knowledge or veracity.[12]

---

[12] "[T]he veracity of persons supplying anonymous tips is by hypothesis largely unknown, and unknowable." *Alabama v. White*, 496 U.S. 325, 329 (1990) (quotation marks omitted).  The resulting

*Id.* at 329. In addition, the Court explained that "[r]easonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. . . . [I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 330. Although the case was "close," the Court concluded, for two main reasons, that the tip had been "sufficiently corroborated" to provide reasonable suspicion that White was engaged in criminal activity when the police stopped her. *Id.* at 331-32. First, "the independent corroboration by the police of *significant aspects of the informer's predictions* imparted some degree of reliability to the other allegations made by the caller." *Id.* at 332 (emphasis added). Second, the Court found it "important" that the tipster, like the tipster in *Gates*, provided "'a range of [predictive] details relating . . . to future actions of third parties ordinarily not easily predicted.'" *Id.* (quoting *Gates*, 426 U.S. at 245). The Court emphasized "the caller's ability to predict [White's] *future behavior*, [which] demonstrated *inside information—a special familiarity* with [White's] affairs":

---

risk singularly presented by stops based on wholly anonymous tips is that any citizen "could face significant intrusion on the say-so of an anonymous prankster, rival, or misinformed individual," which would contravene the Fourth Amendment's prohibition on unreasonable seizures. *United States v. Roberson*, 90 F.3d 75, 80-81 (3d Cir. 1996).

> Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.

*Id.* (emphasis added and citation omitted).

[¶15]  The Court relied on similar reasoning to reach a different result ten years later in *Florida v. J.L.*, 529 U.S. 266, 269-72 (2000).  There, an anonymous caller reported that a young Black man "standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  *Id.* at 268.  Two police officers went to the bus stop and saw three Black men there, one of whom was wearing a plaid shirt.  *Id.*  The Court concluded that the police did not have sufficiently reliable information to justify a stop of the man wearing the plaid shirt because the anonymous call "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility."  *Id.* at 271.  Although the "description of the suspect's visible attributes proved accurate," the Court reasoned that "[t]he reasonable suspicion here at issue requires that a tip be *reliable in its assertion of illegality*, not just in its tendency to identify a determinate person."  *Id.* at 271-72 (emphasis added).  The Court also contrasted the case with cases involving "a

tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." *Id.* at 270.

[¶16]  Finally, in the Supreme Court's most recent anonymous-tip case, *Navarette v. California*, police stopped a pickup truck that matched the description of a truck that an anonymous 9-1-1 caller said had run her off the road.  572 U.S. 393, 395-96 (2014).  Although this was another "close case," *id.* at 404 (quotation marks omitted), the Court concluded that the call bore sufficient indicia of reliability for the officer to credit the allegation and make the stop because (1) the call was nearly contemporaneous with the allegedly illegal activity, placing it in a category of "especially reliable" information; (2) the call suggested "eyewitness knowledge of the alleged dangerous driving"; and (3) the caller's "use of the [9-1-1] emergency system" was an "indicator of veracity" because 9-1-1 calls can be recorded and traced and persons making false reports may be subject to prosecution, *id.* at 398-401.

[¶17]  Our analysis is therefore guided, at the outset, by the critical difference between cases in which the police rely on information provided by an anonymous tip and those in which the information generating suspicion is provided by a known informant. *See, e.g.*, *United States v. Monteiro*, 447 F.3d 39, 44 (1st Cir. 2006) ("Anonymous tips are a different matter."); 4 Wayne

R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.5(i) ("[T]he anonymous tipster is generally least deserving of reliance . . . ."); *Adams*, 407 U.S. at 146-47; *United States v. Lopez-Gonzalez*, 916 F.2d 1011, 1014 (5th Cir. 1990) ("[T]ips from known informants are more likely to be credible and are thus entitled to greater weight in the *Terry* stop reasonable suspicion analysis.").

[¶18]  The Supreme Court's decisions also demonstrate the fact-specific nature of determining whether investigative information that begins with a wholly anonymous tip gives rise to a reasonable, articulable suspicion of wrongdoing.  Although "no single rule can be fashioned to meet every conceivable confrontation between the police and citizen," *State v. Lesnick*, 530 P.2d 243, 246 (Wash. 1975), the analysis must focus primarily on

- the extent and specificity of predictive detail regarding future criminal activity contained in the tip;

- the extent to which the predictive detail contained in the tip involved information that could be supplied only by a person with knowledge of the criminal activity alleged, rather than information available more generally or to the public at large; and

- the extent to which the police were able to confirm the accuracy of the predictive detail in the tip through their own observation or independently obtained, reliable information.

*See White*, 496 U.S. at 328-32; *J.L.*, 529 U.S. at 269-72. *White* establishes that the corroboration by police of the accuracy of an anonymous tip need not include observation of actual criminal activity, provided that the tip includes a substantial quantity of predictive description that only someone with knowledge of the described plan of activity could supply, and provided that the police through their own observation or other investigation are able to confirm the accuracy of the predictive description to a significant degree. *White*, 496 U.S. at 328-32. *J.L.* illustrates the inverse—that an anonymous tip containing no prediction of future activity, but only a description of present circumstances visible to any passerby, is insufficient if the police have not confirmed the tip's assertion of *illegality* through their own observation or through independently obtained reliable information. *J.L.*, 529 U.S. at 269-72.

## B. The Stop of Barclift

[¶19]   Here, we examine whether the police developed sufficient information to justify a reasonable belief that the tipster's assertion of illegality was reliable, bearing in mind that the tip regarding Barclift itself was wholly anonymous and included no predictive information.  The tip gave some specific information about Barclift, but it was lacking in material respects.  The tip included no prediction that Barclift would be traveling to Maine by bus on a

particular date, and it included no information so personal that it suggested that the tipster would have been privy to any illegal activity by Barclift. The absence of any prediction of Barclift's actions at a particular future time means that the tip lacked an element that the Supreme Court has deemed highly material, if not essential, to determining the reliability of an anonymous tip: predictive information indicative of the informant's insider knowledge of planned criminal activity. *See Gates*, 462 U.S. at 245-46; *White*, 496 U.S. at 328-32; *J.L.*, 529 U.S. at 269-72.

[¶20] In fact, none of the Supreme Court's recent decisions involving the reliability of anonymous tips involved a tip lacking any specific assertion of criminal activity on a particular date. Some other courts have, however, analyzed the reliability of anonymous tips that, like the tip regarding Barclift, asserted habitual or ongoing illegal drug activity by one or more persons without any prediction that the asserted activity would occur on a particular date. *See Commonwealth v. Goodwin*, 750 A.2d 795, 796-99 (Pa. 2000); *State v. Boson*, 778 So. 2d 687, 688-95 (La. Ct. App. 2001).

[¶21] In *Goodwin*, for example, the police received an anonymous tip that was highly detailed in identifying and describing the defendant and her habits,

including her practice of selling illegal drugs from her home and workplace.[13] 750 A.2d at 796. However, the tip did not include any prediction that the defendant would be engaged in the asserted criminal activity on a particular date. *Id.* When the police began to follow the defendant in her vehicle, they "saw no unusual activity . . . and had no reason independent of the anonymous tip to suspect that criminal activity was afoot. Thus, the allegations of criminal conduct furnished by the anonymous tipster remained uncorroborated." *Id.* at 799. As a result, applying the Supreme Court's Fourth Amendment jurisprudence,[14] the court held that the police had insufficient information to justify stopping the defendant. *Id.* Although the tip disclosed many details about the defendant's age, appearance, dress, home address, and workplace, some of which were corroborated by police observation, the court noted that anyone who worked with her or otherwise knew her could have supplied that information. *Id.*

---

[13] "The caller . . . stated that the [defendant] always carries a quarter pound of marijuana in a pink bag and that children buy drugs from her. Also, the [defendant] takes a one-hour lunch break at about 12:15 and drives a blue Mustang, registration AKA 2168, which was parked that day on the inside corner of a parking garage. The caller described the [defendant] as [twenty-five] years old, with red hair, and stated that she was wearing a red coat and red stockings on that particular day. The anonymous caller then provided the name and address of the [defendant's] employer, the street she lived on, the location of the parking garage, and the route [she] took to walk to the garage." *Commonwealth v. Goodwin*, 750 A.2d 795, 796 (Pa. 2000).

[14] The court noted that although the defendant raised claims under both the Fourth Amendment and the state constitution, it had "consistently followed Fourth Amendment jurisprudence in stop and frisk cases." *Goodwin*, 750 A.2d at 797 n.3.

18

[¶22]  In *Boson*, the police stopped and searched the defendants based on complaints about two individuals who "were supposed to be operating narcotics" from a hotel in a high-crime area.  778 So. 2d at 688 (quotation marks omitted).  Other than a description of the individuals and their vehicle, the complaints provided no predictive information about the individuals' actions, and the police executed the stop as soon as they saw individuals and a vehicle matching the description at the hotel, without having observed any activity by the individuals.  *Id.*  Analyzing the unverified complaints as if they collectively constituted an anonymous tip, the court summarized the facts and the conclusion to be drawn from them as follows:

> There was no testimony at all about the source of the [complaints]. The informant therefore must be assumed by this court to have been unknown and untested.  The officers went to the scene with the vague knowledge that drugs were being sold at some undetermined time, and that two black men who had a white LTD were involved in the transactions.  They immediately stopped [the defendants] upon seeing them.   The defendants were not performing any suspicious activity at the time they were stopped. Thus, based on the facts presented, . . . the officers lacked reasonable suspicion to stop [the defendants].

*Id.* at 694-95 (footnote omitted).

[¶23]  Because the tip regarding Barclift was lacking in predictive information that, if confirmed as accurate, might have validated the reliability of the tip, the police needed to obtain independent information corroborating

the tipster's assertion of illegal conduct in order to establish an objectively reasonable suspicion of wrongdoing on the day of the stop. *See Goodwin*, 750 A.2d at 799; *Boson*, 778 So. 2d at 691-95; *Gates*, 462 U.S. at 245-46; *White*, 496 U.S. at 328-32; *J.L.*, 529 U.S. at 269-72. One means of doing so would be to obtain reliable information through other sources. The necessary information could also have been obtained through surveillance prior to a stop, among other means, but the police stopped Barclift without having observed anything suspicious. *See United States v. Roberson*, 90 F.3d 75, 81 (3d Cir. 1996) (explaining that "the police were not powerless to act on the non-predictive, anonymous tip they received" because they could have surveilled the defendant, but that there was no reasonable suspicion to support a stop "[i]n the absence of any observations of suspicious conduct or the corroboration of information from which the police could reasonably conclude that the anonymous tipster's allegation of criminal activity was reliable").

[¶24] The tipster's generalized assertions that Barclift regularly rode the bus to Maine with a bag or backpack and that he was a rap artist do not imply inside knowledge of criminal activity on Barclift's part. Anyone who knew Barclift or knew about his bus travel and rap career could have provided that information. *See State v. Rabon*, 2007 ME 113, ¶ 34, 930 A.2d 268; 4 Wayne

R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.5(i).

[¶25]  The additional information that the police were able to develop, in their follow-up efforts to validate the reliability of the tip, was limited and did not lend credibility to the assertion of illegal activity.  The police confirmed that Barclift had, indeed, frequently taken the Concord Trailways bus from New York to Maine.  Certain "[f]actors consistent with innocent travel, when taken together, can give rise to reasonable suspicion, even though some travelers exhibiting those factors will be innocent."  *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006).  Frequent interstate bus travel, on the other hand, is not alone indicative of criminal activity.  *See State v. Alexander*, 139 A.3d 574, 581-82 (Vt. 2016) (rejecting the notion that bus travel from out of state can support a reasonable suspicion of criminal activity "because 'a very large category of presumably innocent travelers' do the same" (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980))).  Corroboration of this activity lent little, if any, credibility to the tipster's assertion of illegality.  The police officers also learned, from their source at the bus company, that Barclift paid cash for his bus tickets, a fact that might be deemed indicative of an effort to leave no traceable record of his travel and therefore probative of a criminal purpose. *See United States v. Sokolow*, 490 U.S. 1, 8-9 (1989).  But the State's first witness

at the suppression hearing acknowledged that the source also disclosed that Barclift bought the tickets in his own name, belying any notion that Barclift was attempting to conceal his identity.[15] The police obtained information indicating that Barclift had a criminal history, but the suppression record is vague as to the details and silent on whether the criminal history was very old or very recent or somewhere in between. *See Monteiro*, 447 F.3d at 47 ("[C]ourts have found that an individual's criminal history corroborated *reliable information, such as a police officer's own observations*, in constituting reasonable suspicion." (emphasis added)). Moreover, there is no evidence in the suppression record that the police corroborated the accuracy of other assertions in the tip, such as that Barclift habitually carried a firearm or that he used an alias to purchase bus tickets.[16] *See Gates*, 462 U.S. at 234 (explaining that "all the various indicia of reliability (*and unreliability*) attending an informant's tip" should be considered in the totality-of-the-circumstances analysis (emphasis added)).

---

[15] The witness testified that the tipster had stated that Barclift used an alias when purchasing bus tickets and acknowledged that "that piece of information in the anonymous tip was incorrect." That discrepancy, along with the other portions of the tip that the police could not verify, could raise doubt about the reliability of the tip.

[16] The State also urges us to consider that "[i]t is known that New York is a source state for illegal drugs, that transportation by bus is a widely used and common method for smuggling drugs into Maine, and that those involved in drug activity almost exclusively operate in cash." The trial court did not make those findings (or rely on that rationale), and there was no evidence admitted during the suppression hearing that would support such findings.

[¶26]  As did the United States Supreme Court in *White,* we acknowledge that this case is close, but it lands on the other side of the line.  What is lacking is evidence that the police were able to confirm the anonymous tipster's assertion of illegality by (1) corroborating a prediction of Barclift's actions that was sufficiently specific and detailed to indicate inside knowledge of a plan to commit a crime or (2) independently obtaining reliable information, through their own direct observation or from known reliable sources, corroborating the tipster's assertion of illegality.[17]  The information that the police obtained in attempting to corroborate the anonymous tip was not enough to indicate that

---

[17]  The dissent acknowledges the Supreme Court's holding that the police must corroborate "significant aspects of the informer's predictions" to "impart a degree of reliability to the allegations made by the tipster," Dissenting Opinion ¶ 30; *see White*, 496 U.S. 325, 331-32; *Florida v. J.L.*, 529 U.S. 266, 269-72 (2000), but would conclude that the police were justified in stopping and detaining Barclift based on (1) a non-predictive, partly inaccurate description of past activity from an anonymous person who could have been any past or present acquaintance and (2) "evidence of a drug courier profile," Dissenting Opinion ¶ 39.  Although frequent purchases of bus tickets for travel between New York and Maine may fit one piece of a drug courier profile, they are not criminal acts, nor are they enough in themselves to generate a reasonable suspicion that the purchaser is a criminal. As we said in *State v. Lovell*, "more is required."  *State v. Lovell*, 2022 ME 49, ¶ 20, --- A.3d ---.  In *Lovell*, we decided that reasonable suspicion of wrongdoing existed because the police obtained, in addition to information about behavior that was consistent with a drug courier profile, a known informant's direct observation of evidence of a crime on a specific date.  *Id.* ¶¶ 23-26.  Specifically, a train conductor reported that the suspect had appeared impaired during his most recent short-turnaround train journey to and from a known source city and that the conductor had found a crack pipe on the seat where the suspect and his companion had been sitting.  *Id.*  Here, the police obtained no comparable confirmation of ongoing criminal activity regarding Barclift.  What they did confirm did not indicate the anonymous tipster's knowledge of anything beyond Barclift's work as a rapper and his frequent bus travel between New York and Maine.  They also learned that the tipster was wrong in asserting that Barclift used an alias to buy bus tickets—information that undermined the reliability of the tip.

the tipster's assertion of illegality was reliable.  Because the stop of Barclift that led to his conviction lacked a constitutional basis, we vacate the judgment.

The entry is:

> Judgment vacated.  Remanded for further
> proceedings consistent with this opinion.

---

JABAR, J., dissenting.

[¶27]  I respectfully dissent because I believe that the trial court properly considered the totality of the circumstances and did not err when it concluded that the police officers had a reasonable suspicion of illegal activity resulting from the two anonymous tips and the evidence suggesting that Barclift fit a drug courier profile.

[¶28]  "When reviewing the denial of motion to suppress . . . we review the trial court's findings for clear error and its legal conclusions de novo." *State v. Chan*, 2020 ME 91, ¶ 13, 236 A.3d 471.  We uphold the trial court's decision "if any reasonable view of the evidence supports [it]." *State v. Ormsby*, 2013 ME 88, ¶ 9, 81 A.3d 336 (quotation marks omitted); *State v. Clark*, 2021 ME 12, ¶ 25, 246 A.3d 1165 (quotation marks omitted).  The Court holds that the trial court erred by concluding that the anonymous tips received by law enforcement were

24

sufficiently corroborated to establish reasonable, articulable suspicion. Court's Opinion ¶¶ 23-26. I disagree. I believe that a reasonable view of the evidence supports the trial court's conclusion.

[¶29] An officer must have "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted). The likelihood of criminal activity does not have to "rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274. The concept of reasonable suspicion is "fluid" and "take[s] [its] substantive content from the particular contexts in which the standards are being assessed." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). We view reasonable suspicion to conduct an investigatory stop "from the standpoint of an objectively reasonable police officer," *id.*, and base it on "the totality of the circumstances." *State v. Littlefield*, 677 A.2d 1055, 1057 (Me. 1996). When analyzing the totality of the circumstances, officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them . . . ." *Arvizu*, 534 U.S. at 273. An investigatory stop must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that

intrusion." *State v. Eastman*, 1997 ME 39, ¶ 6, 691 A.2d 179 (quotation marks omitted).

[¶30]   Anonymous tips may be the basis of reasonable suspicion if corroborating independent police work exhibits sufficient indicia of reliability to create reasonable suspicion for an investigatory stop. *Alabama v. White*, 496 U.S. 325, 326-27, 332 (1990).  Something more than an anonymous tip itself is required to justify a Fourth Amendment intrusion.  *Id.* at 329-30.  The independent corroboration by the police of significant aspects of the informer's predictions will impart a degree of reliability to the allegations made by the tipster.  *Id.* at 331-32.  "[C]orroboration can consist of [an] officer verifying details such as the physical description and location of a suspect" and does not require that an officer observe illegal behavior.  *State v. Vaughan,* 2009 ME 63, ¶ 12, 974 A.2d 930 (quotation marks omitted).

[¶31]   Here, there were two anonymous tips that supplied law enforcement with Barclift's full name, his alias as a rap artist known as 'DownLeezy,' his date of birth, and information that he had regularly traveled to Maine (both Brunswick and Augusta) from New York transporting hundreds of grams in illegal drugs—heroin and/or cocaine—in a backpack since 2014.

The tip also provided Barclift's specific method of travel—by bus on Concord Trailways.

[¶32]  To corroborate the specific allegation that Barclift was illegally transporting drugs from New York to Maine by bus on a regular basis, law enforcement contacted Concord Trailways.  From a source at Concord Trailways, they learned that Barclift had been purchasing tickets from New York to Maine for six years, dating back to 2014.  They also learned that Barclift had purchased ten bus tickets to Maine in January 2020 and had made four trips that month.  Law enforcement also determined that Barclift always paid cash for the tickets.  Further corroboration came on January 22, 2020, when law enforcement learned from Concord Trailways that Barclift had purchased a bus ticket for travel to Augusta for that day.

[¶33]  Police also confirmed the alias supplied by the tips and confirmed that Barclift did use the "DownLeezy" alias when he performed rap music.  The officers also obtained a photo identification of Barclift and confirmed his prior criminal record, including a narcotics conviction.

[¶34]  Viewing the totality of the circumstances, the anonymous tip, which contained a range of details, indicated "a fair probability" that the tipster had obtained their information from Barclift or someone Barclift trusted.  *See*

*Illinois v. Gates*, 462 U.S. 213, 245-46 (1983). Numerous features of the tip—Barclift's identity, Barclift's use of Concord Trailways, the long period in which he'd been using the bus line, the large number of tickets purchased by Barclift since 2014, and a recent purchase of tickets—were corroborated by law enforcement investigation.

[¶35] The specificity of the tips and the corroboration by law enforcement revealed information highly consistent with the tips and in their totality demonstrated conduct consistent with drug trafficking.

[¶36] In *State v. Lovell*, we recently discussed the evidence of a drug courier profile and how, when coupled with some other evidence, that may give rise to a reasonable articulable suspicion.

> A "drug courier profile" is a loosely defined set of otherwise innocuous behaviors that the Supreme Court has described as "an abstract of characteristics found to be typical of persons transporting illegal drugs." *Florida v. Royer,* 460 U.S. 491, 493 n.2 (1983); *see also Reid v. Georgia,* 448 U.S. 438, 440 (1980). Other courts have held that a drug courier profile may be used as a starting point for an investigation; however, consistency with a bare profile alone cannot amount to reasonable suspicion of illegal activity, because those who engage in the activities that the profile describes include large numbers of innocent people. *E.g., United States v. Sokolow,* 490 U.S. 1, 10 (1989); *United States v. Marrocco,* 578 F.3d 627, 633 (6th Cir. 2009); *United States v. Torres,* 949 F.2d 606, 608 (2nd Cir. 1991); *State v. Trainor,* 925 P.2d 818, 827 n.8 (Haw. 1996) (citing *Commonwealth v. Lewis,* 636 A.2d 619, 624 (Pa. 1994)).

> When law enforcement personnel are aware of characteristics or behaviors that fit a drug courier profile but do not independently point to illegal behavior, our established case law treats that awareness as the equivalent of an "unsubstantiated hunch." In those instances, more is required for an officer to establish reasonable articulable suspicion that a violation of law has occurred, is occurring, or will occur. *See State v. Simons*, 2017 ME 180, ¶ 12, 169 A.3d 399; *State v. Sasso*, 2016 ME 95, ¶¶ 7, 14, 143 A.3d 124; *State v. Porter*, 2008 ME 175, ¶¶ 9, 11, 960 A.2d 321. The "more" that is needed is information that is "reliable in its assertion of illegality," *State v. Lafond*, 2002 ME 124, ¶ 10, 802 A.2d 425 (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000)), because "in making a determination of [reasonable articulable suspicion] the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts," *Sokolow*, 490 U.S. at 10 (quotation marks omitted).

*State v. Lovell*, 2022 ME 49, ¶¶ 19-20, --- A.3d ---.

[¶37]  Behaviors that courts have stated are indicative of a drug courier profile include arrival from a source city, *United States v. Sokolow*, 490 U.S. 1, 3 (1989); *Reid v. Georgia*, 448 U.S. 438, 441 (1980); payment for tickets in cash, *Sokolow*, 490 U.S. at 3; *Florida v. Royer*, 460 U.S. 491, 493 n.2 (1983); and excessively frequent travel to a source city, *United States v. Elmore*, 595 F.2d 1036, 1039 n.3 (5th Cir. 1979); *see* 27 James W. Moore et al., *Moore's Federal Practice - Criminal* § 641.130 (Mathew Bender, 3d ed. 2022) (discussing drug courier profiles used throughout the United States).

[¶38]  An anonymous prediction of a person's legal activities fitting the drug courier profile can be sufficient to generate a reasonable suspicion of illegality when the information is sufficiently detailed and confirmed to be accurate in its prediction of the person's actions so that it supports a reasonable belief that the source of the information has inside knowledge of a plan to commit a crime.  *See White*, 496 U.S. at 332 ("When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.").

[¶39]   Here, we have evidence of a drug courier profile *plus* two anonymous tips containing *specific* information relating to Barclift's transportation of illegal drugs.  In *Lovell*, 2022 ME 49, ¶¶ 2-4, --- A.3d ---, the information was limited to assertions of numerous trips between Maine and an area known for drugs and a tip from a train conductor who weeks earlier indicated that he saw Lovell "high" and that he found a crack pipe where Lovell was sitting.  This is not evidence of a crime on a specific date as the Court asserts.  Court's Opinion ¶ 26 n.16.  There was no definitive assertion of predictive behavior in *Lovell*, just an inference based on a train conductor's observation that Lovell was transporting drugs; whereas here, the two tips

received by law enforcement asserted that Barclift would be transporting heroin and/or cocaine in a backpack while travelling to Maine on Concord Trailways. This is much more evidence of predictive behavior than the tip from the train conductor in *Lovell*, who indicated that he saw Lovell "high" and found a crack pipe where Lovell was sitting. While neither an anonymous tip nor evidence of a drug courier profile alone are enough to create reasonable, articulable suspicion, the combination of two anonymous tips and a drug courier profile corroborate each other and these facts were independently corroborated by law enforcement. A reasonable view of the evidence supports the trial court's determination of reasonable, articulable suspicion.

[¶40] I would affirm the trial court's decision suppressing Barclift's statements made while at the Augusta Police Department on January 22, 2020, prior to the administration and waiver of his Miranda rights but denying the motion to suppress in all other respects.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Timothy Barclift

Aaron M. Frey, Attorney General, and Katie Sibley, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine