STATE OF MAINE                    UNIFIED CRIMNAL COURT
KENNEBEC, SS.                     AUGUSTA
                                  DOCKET NOS. CR-2021-1022 &
                                             CR-2021-1027


STATE OF MAINE,
                                  **DECISION AND ORDER ON MOTIONS**
                                  **TO SUPPRESS**

        v.

JOHN CEDENO,                                          AUGUSTA COURT
        and                                           DEC 14 '22 AM 7:

CHELSEY COCHRAN,

        Defendants.

## INTRODUCTION AND PROCEDURAL HISTORY

Before the court for resolution are several motions to suppress filed by
John Cedeno and Chelsey Cochran. Both Cedeno and Cochran have moved
to suppress (1) all evidence seized as a result of the stop and search of
Cochran's motor vehicle on July 20, 2021, after it passed through the Gardiner
toll booth heading northbound and (2) all evidence as a result of the search of
the automobile based on a canine sniff of the vehicle. The search of the
vehicle uncovered a significant quantity of cocaine in the trunk of the car. In
addition, Cochran has also moved to suppress (3) any statements she made to
law enforcement officers on July 20, 2021, after she was read her *Miranda*
warnings and (4) any statements she made to S/A Jordan Brooks during a
phone conversation with him on August 13, 2021.

In a Complaint dated July 21, 2021, Chelsey Cochran was charged with
one count of Aggravated Trafficking in Cocaine (Class A). On the same date,

John Cedeno was charged with two counts of Aggravated Trafficking in Cocaine (Class A) and one count of Criminal Forfeiture of $1,871.00.[1]

In an Indictment dated September 23, 2021, Cochran was charged with Aggravated Trafficking in Cocaine (Count 1) (Class A), Illegal Importation of Cocaine (Class B), and Criminal Forfeiture of a 2007 Audi automobile (Count 3). On the same date Cedeno was indicted for Aggravated Trafficking in Cocaine (Count 1) (Class A based on quantity); Aggravated Trafficking in Cocaine (Count 2) (Class A based on a prior conviction), Aggravated Illegal Importation of Cocaine (Count 3) (Class A based on a prior conviction), and Criminal Forfeiture of $1,871.00 (Count 4).

Beginning in October 2021, Cedeno and Cochran filed the motions to suppress described above. Three days of testimonial hearings were held on February 15, 2022, May 26, 2022, and July 12, 2022. Cedeno and Cochran joined each other's motions to suppress relating to the stop of the motor vehicle and the canine sniff. The parties engaged in extensive briefing of the issues throughout the Summer and Fall of 2022.

On September 27, 2022, the Law Court decided *State v. Timothy Barclift*, 2022 ME 50, 282 A.3d 607. On September 30, 2022, the court invited counsel for the parties to file supplemental memoranda addressing the *Barclift* opinion and any relevance it may have to this case. The parties accepted the court's invitation and submitted additional briefs. Oral argument was held on November 17, 2022.

During the evidentiary hearings held on the difference aspects of the motions to suppress, the court received the testimony of Special Agent Jordan

---

[1] Count 1 of the complaint against Cedeno charged him with Aggravated Trafficking in Cocaine based on the quantity of cocaine, while Count 2 charged him with the same offense based on a prior conviction of Aggravated Trafficking.

Brooks (February 15, 2022) and Corporal Derrick Record (February 15, May 26 & July 12, 2022). The court also admitted into evidence State's Exhibits 1-9, and Defense Exhibits 1-2.[2] Based on the evidence presented at the evidentiary hearings, and after consideration of the parties' oral and written arguments, the court makes the following factual findings.

## FACTS

As of the date of his testimony in this case, Jordan Brooks had been a special agent with the Maine Drug Enforcement Agency for approximately 3 years. On July 19, 2021, S/A Brooks received a phone call from Officer Matthew Buck of the Winslow Police Department. Officer Buck told S/A Brooks that he (Buck) had spoken to someone who wanted to pass along "drug information." Specifically, the caller who was never identified, told Officer Buck that Chelsey Cochran "would be" travelling to New York City in her vehicle with an African American male know as "Papers." The purpose of the trip, according to the caller, was to pick up 2 pounds of crack cocaine.

S/A Brooks testified that by the time he spoke to Officer Buck on July 19, 2021, he was under the impression that the trip to New York City had happened within the past day or so. Through his work with MDEA, S/A Brooks recognized "Papers" as being the street name of John Cedeno, who had been arrested by MDEA in 2015.

Based on the anonymous information given to him by Officer Buck, and recognizing "Papers" as John Cedeno, S/A Brooks set about to try to corroborate or verify that information. First, he went on "Facebook" and was able to obtain a screenshot of Chelsey Cochran's Audi automobile. From Cedeno's Facebook page, Brooks was able to see that Cedeno was "friends

---

[2] State's Exhibit 10 was marked but not offered or admitted.

with Chelsey Cochran," and that Chelsey made comments on Cedeno's Facebook page, thus establishing some connection between them. Next, Brooks made a motor vehicle registration inquiry for vehicles owned by Cochran and learned that a 2007 Audi with Maine license plate number 410 YD was registered to her. With that information, S/A Brooks submitted a license plate reader inquiry to the Maine Information and Analysis Center (MIAC).

On July 20, 2021, Brooks drove by Chelsey Cochran's address at 97 Nowell Road in Winslow but did not see her vehicle there. Later that morning—between 11:00 a.m. and noon—S/A Brooks did see the 2007 Audi at Chelsey's residence. When the car left the residence a short time later with Chelsey driving, S/A Brooks followed it. After stopping to fill up with gas, Chelsey drove to Fairfield where she picked up an unidentified male subject.

S/A Brooks kept the vehicle and its two occupants under surveillance as it entered Interstate 95 southbound at Waterville. Brooks kept the vehicle under surveillance until approximately 1:30 p.m. on July 20, 2021, when it crossed into New Hampshire. Brooks called a colleague with the New Hampshire State Police to ask that the Cochran vehicle be watched for when it came back through New Hampshire heading northbound. In the meantime, Brooks waited at the Kittery toll booths for the car to return to Maine.

While waiting near the Maine-New Hampshire state line, S/A Brooks received a response to his license plate reader inquiry. According to the information from MIAC, the vehicle with Maine registration # 410 YD traveled into New York City shortly before 11:00 p.m. on July 18, 2021 and traveled outbound from the city an hour later. *See State's Exhibit 7.* This information, from the standpoint of S/A Brooks, corroborated what the anonymous caller had told Officer Buck, i.e., that Chelsey Cochran's vehicle

4

had gone to New York City in the very recent past. Moreover, the time involved, namely, one hour late at night, in a "drug source level area," was consistent with illegal drug activity such as "money drops" and/or pick-ups of product.

At around 4:30 p.m. on July 20, 2021, S/A Brooks received a call from his contact with the New Hampshire State Police telling him that the 2007 Audi was heading northbound towards Maine. Brooks opined that the timeframe involved (about 3 hours leaving Maine and returning) was consistent with a trip to South Station in Boston, a known high drug trafficking location, although he acknowledged that this was simply a "guess" on his part, and he had "no idea" where the vehicle had gone once it left the State of Maine heading south.

S/A Brooks reestablished surveillance of the 2007 Audi at about Exit 6 northbound on the Maine Turnpike. He followed it as it got off at an exit in Falmouth. The vehicle was off the highway for about 20-30 minutes and then re-entered the highway, heading north.[3] While it was off the "highway" the vehicle made no stops, leading S/A Brooks to suspect that it might have been engaged in countersurveillance.

The 2007 Audi with Ms. Cochran driving, and Mr. Cedeno is the front passenger seat, was stopped just past the Gardiner toll booth. The stop was made there so that the case would stay in the coverage area of the MDEA agents. Corporal Derrick Record of the Maine State Police made the stop at the direction of those agents. Cpl. Record directed Cochran and Cedeno to get out of the car and stand at the rear. He informed them that the car had

---

[3] The evidence was not clear as to where the 2007 Audi re-entered the "highway." In light if where the vehicle was ultimately stopped by the police, the court assumes that it got back on the "highway" and continued to travel northbound on I-295.

been stopped on the suspicion of illegal drug activity. After Cochran and Cedeno got out of the car, Record promptly deployed his certified drug recognition canine, Tess. Tess circled the vehicle and almost immediately began aggressively barking and whining. Cpl. Record determined that the dog's behavior indicated the presence of drugs, at which point Cochran and Cedeno were handcuffed, and a search of the vehicle began. A substantial amount of what was believed to be cocaine was found in the trunk of the car.

Cpl. Record testified on all three days of the evidentiary hearing. Much of the questioning focused on whether Tess's barking was a reliable indicator for the presence of drugs because her typical indicator is to sit. Record explained this by observing that the amount of drugs found in the trunk was over 4 pounds and the sheer quantity and corresponding odor could overwhelm Tess and change her typical method of indicating.

After Cochran was in custody, while she was sitting in a police cruiser, she was read *Miranda* warnings by S/A Tiffani Warren. When told that she had the right to remain silent and that anything she said could be used against her, Cochran spoke up and said she had nothing to say. S/A Warren said she needed to complete the administration of the warnings. When told that she had the right to an attorney before any questioning, Cochran said she wanted a lawyer. S/A Warren again said that she needed to finish reading the warnings. When asked if she wanted to answer any questions with or without a lawyer being present, Cochran again announced that she wanted a lawyer.

While Cochran was still sitting in the cruiser, S/A Brooks approached her and attempted to convince her that she should cooperate and speak with him. When Cochran repeated that she had nothing to say, Brooks walked away. Nevertheless, S/A Warren continued to engage in conversation with

6

Cochran. Ultimately, Cochran was transported to the Kennebec County Correctional Facility.

On August 12, 2021, Cochran called S/A Brooks and left a voice message for him about getting her phones back. At that time, Cochran had made her initial appearance and had been appointed a lawyer. She had also been released on bail. S/A Brooks returned Cochran's call the next day, August 13, 2021. During that return phone call, which did not last very long, Cochran made statements that could be considered inculpatory. S/A Brooks told Cochran that she could not have the phones back and that she should contact her lawyer. He then ended the call.

## DISCUSSION

It is well-established that for the police to make an investigatory stop of a person or motor vehicle, the law enforcement officer must have "'an articulable suspicion that criminal conduct has taken place, is occurring, or imminently will occur.'" *State v. Lafond*, 2002 ME 124, ¶ 6, 802 A.2d 425. The articulable suspicion must be objectively reasonable. *State v. Simmons*, 2016 ME 49, ¶ 8, 135 A.3d 824. It has been said that "the threshold for demonstrating an objectively reasonable suspicion necessary to justify a vehicle stop is low . . . . 'The suspicion need only be more than a speculation or an unsubstantiated hunch.'" *State v. LaForge*, 2012 ME 65, ¶ 10, 43 A.3d 961.

While the standard described as "objectively reasonable, articulable suspicion," may be a relatively low one, both the United States Supreme Court and the Maine Law Court have made it clear that information supplied by an anonymous informant is subject to a more exacting level of scrutiny to determine whether it can be relied on to justify a stop of a person or vehicle.

7

In *State v. Barclift*, the Law Court provided a comprehensive review of the caselaw involving stops based on information provided by an anonymous source. The Court emphasized "the critical difference between cases in which the police rely on information provided by an anonymous tip and those in which the information generating suspicion is provided by a known informant." 2022 ME 50, ¶ 17. The Law Court's analysis of the Supreme Court's decisions led it to conclude that whether an "anonymous tip gives rise to a reasonable, articulable suspicion of wrongdoing," is fact-specific and must focus on the following:

- the extent and specificity of predictive detail regarding future criminal activity contained in the tip;

- the extent to which the predictive detail contained in the tip involved information that could be supplied only by a person with knowledge of the criminal activity alleged, rather than information available more generally or to the public at large; and

- the extent to which the police were able to confirm the accuracy of the predictive detail in the tip through their own observation or independently obtained reliable information.

*Id.* ¶ 18.

To establish an objectively reasonable, articulable suspicion, it is not necessary for the police themselves to witness criminal activity, "provided that the tip includes a substantial quantity of predictive description that only someone with knowledge of the described plan of activity could supply, and provided that the police through their own observation or other investigation are able to confirm the accuracy of the predictive description to a significant degree." *Id.* Stated otherwise, "an anonymous tip containing no prediction of future activity, but only a description of present circumstances visible to any passerby, is insufficient if the police have not confirmed the tip's assertion

8

of *illegality* through their own observation or through independently obtained reliable information." *Id.* (emphasis in original).

What then is the predictive detail in the anonymous tip here? It is, quite simply, that Chelsey Cochran "would be" or had gone to New York City with "Papers" in Cochran's vehicle to pick up 2 pounds of crack cocaine. In the court's view, the predictive detail contained in this tip was minimal. It basically asserts that Cochran and her companion, "Papers," went to New York City to get drugs. The court does not believe that this tip contained the "substantial quantity of predictive description" contemplated by the Court in *Barclift.*

As an initial matter, the evidence was unclear whether the anonymous tipster, when spoken to by Officer Buck, was describing a past event or predicting a future one when he/she said that Cochran and Papers "would be" going to New York City. It sounds like it might be "predictive," but the court is unsure, and Officer Buck did not testify.

S/A Brooks was aware that Papers was a street name for John Cedeno and he was also aware of information about Cedeno's arrest by MDEA in 2015. With this knowledge, S/A Brooks set about to confirm the anonymous tip's assertion of illegality. He did that by trying to confirm that Cochran and Cedeno had some connection to each other through Facebook. He also verified that Cochran owned a vehicle—a 2007 Audi. And he tried to confirm that the car had been to New York City recently and he did that by submitting a license plate reader request through MIAC.

While that request was pending, S/A Brooks began a surveillance of Ms. Cochran and her vehicle. On July 20, 2021, S/A Brooks followed Cochran and her passenger (identified as Cedeno after the stop) to the Maine-New Hampshire line and made note of the time when she returned to Maine.

9

At no point during that surveillance, however, did S/A Brooks observe or otherwise have reliable information that Cochran or the vehicle she was operating was involved in any illegality. As that surveillance was in progress, S/A Brooks learned from MIAC that his license plate reader request for Maine registration # 410 YD had produced a response indicating that the vehicle had gone into New York City shortly before 11:00 p.m. on the night of July 18, 2021 and was outbound from the city almost an hour later.

This at least confirmed the anonymous tip's assertion that Cochran's vehicle had been to New York City very recently. S/A Brooks testified that, based on his experience, the fact that Cochran's vehicle had gone into and out of the city over the course of an hour was consistent with some type of illegal drug activity, such as money drop-offs and/or drug pick-ups. While such otherwise innocent activity may be "consistent" with illegal conduct, it is the court's view that S/A Brooks's conclusion is closer to conjecture or surmise rather than objectively reasonable, articulable suspicion.

When Cochran and her passenger returned to Maine on July 21, 2021, about three hours after having left the State, S/A Brooks resumed his surveillance of the 2007 Audi. At that point, S/A Brooks believed that Cochran's travel southbound on that day could have been consistent with a trip to South Station in Boston, which he described as a known location for drug activity. The officer acknowledged, however, that the idea that Cochran went to South Station was a "guess."

Finally, S/A Brooks was conducting surveillance of Cochran's vehicle when it exited the "highway" at Falmouth, did not make any stops and then got back on the "highway" heading northbound. This behavior, according to S/A Brooks, could be suggestive of countersurveillance by Cochran. The court finds this suggestion to be speculative.

10

In sum, the court finds that law enforcement did not have an objectively reasonable, articulable suspicion to stop Cochran's vehicle on July 21, 2021.[4] Accordingly, the evidence seized from the search of Cochran's vehicle must be excluded from the trials of Cochran and Cedeno.

## CONCLUSION

For the reasons stated above, the Defendants' Motions to Suppress based on the lack of objectively reasonable, articulable suspicion to justify the stop of Chelsey Cochran's vehicle on July 21, 2021 are GRANTED.

Dated: December 14, 2022.

William R. Stokes
Justice, Superior Court

---

[4] In view of the court's ruling regarding the legality of the stop, it is not necessary for the court to address the motions to suppress related to the canine sniff or any statements made by Cochran.