MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2022 ME 49
Docket:       Cum-21-275
Argued:       May 11, 2022
Decided:      September 8, 2022

Panel:        STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, and LAWRENCE, JJ., and
              HUMPHREY, A.R.J.*

STATE OF MAINE

v.

JOSHUA LOVELL

MEAD, J.

[¶1]  Joshua Lovell appeals from a judgment of conviction entered in the trial court (Cumberland County, *Warren, J.*) upon his conditional guilty plea to aggravated trafficking of fentanyl powder, 17-A M.R.S. § 1105-A(1)(M) (2022) (Class A); unlawful possession of cocaine, 17-A M.R.S. § 1107-A(1)(B)(2) (2022) (Class C); endangering the welfare of a child, 17-A M.R.S. § 554(1)(C) (2022) (Class D); and violating a condition of release, 15 M.R.S. § 1092(1)(A) (2022) (Class E), following the denial of his motion to suppress evidence.  We affirm the judgment.

---

* Justice Humphrey sat at oral argument and participated in the initial conference while he was an Associate Justice and, as directed and assigned by the Chief Justice, is now participating in this appeal as an Active Retired Justice.

## I. BACKGROUND

[¶2] "Viewing the evidence in the light most favorable to the court's order on the motion to suppress, the [suppression] record supports the following facts." *State v. Akers,* 2021 ME 43, ¶ 2, 259 A.3d 127 (citation omitted). On December 23, 2019, an Amtrak conductor informed an Amtrak detective that Lovell made a round trip from Portland, Maine to Haverhill, Massachusetts with another man during which the pair disembarked in Haverhill and returned to Portland on the first available train. The conductor reported that the two men appeared to be "high on some kind of drugs" on the return leg of their journey. The next day, the conductor informed the detective that after Lovell and his companion departed the train, he found what appeared to be a "crack pipe" on the seat where the two had been sitting.

[¶3] Based on the conductor's report, the detective consulted an internal Amtrak database and discovered that Lovell had previously made two other trips from Portland to Haverhill in December 2019 and on each trip had stayed in Haverhill for a short time before returning to Portland on the first available train. The detective knew from his training that the Haverhill area was a location where narcotics were obtained and then distributed throughout New England and that passengers who used trains for quick round trips could

be using the train system to transport drugs. He also understood that the Amtrak conductors watch for train passengers who appear to be intoxicated from alcohol or drugs and keep track of where the passengers sit so that the conductors can monitor their well-being. Based on this knowledge and the facts provided to him by the conductor, the detective notified Special Agent Morrison of the Maine Drug Enforcement Agency (MDEA) that Lovell had made several quick round trips from Portland to Haverhill; that the conductor working the train on Lovell's most recent trip reported that Lovell and his companion appeared to be high on drugs during their December 23, 2019, return trip; and that the conductor found what he believed was a crack pipe on the seat where Lovell and his companion had been sitting. Morrison expressed interest in hearing about any quick trips Lovell might make in the future.

[¶4] The conductor contacted the detective on January 11, 2020, and informed him that Lovell was scheduled to make a round trip from Portland to Haverhill that day with a thirty-eight minute stopover in Haverhill. The detective subsequently notified Morrison that Lovell was scheduled to make another quick trip to Haverhill, this time accompanied by a child. Morrison obtained a copy of Lovell's driver's license and current bail conditions, which

4

both provided an address for Lovell located north of Portland,[1] and confirmed the time that the train from Haverhill was expected to arrive back in Portland. Morrison then went to the Portland train station and saw a man leaving the train terminal at a time consistent with the arrival of the train from Haverhill. The man's appearance matched Lovell's driver's license photo and the man appeared to be with a small child. Morrison followed the man and the child as they walked through the station, and he confirmed with other officers outside the station that the man he believed to be Lovell had entered a Honda Civic. As the car drove away, Morrison directed the officers to stop it, which they did as the car was on the I-295 southbound ramp.

[¶5] Based on evidence discovered during the stop of the vehicle, a grand jury indicted Lovell on the four counts for which he was later convicted. He entered not guilty pleas on all counts, and moved to suppress the evidence obtained during the stop, arguing that Morrison lacked an objectively reasonable, articulable suspicion to justify the seizure.

---

[1] The court did not make explicit findings regarding the full route of travel Lovell would have to complete in order to make a round trip from Portland to Haverhill by Amtrak train, but it did find that "Lovell had travelled down to Portland." This finding is supported by Morrison's testimony that the address he obtained for Lovell was located north of Portland, and Morrison's explanation that "[Lovell] would travel to Portland first, via vehicle or bus [] of some kind, or get a ride, and then take public transportation. [Then] a short stopping trip, take the next available train hours north again, just to have someone again pick him up or get public transportation back to his residence . . . ."

[¶6]  The court held a suppression hearing via Zoom on February 1, 2021, during which it heard testimony from the detective and Morrison.  On April 12, 2021, the court denied Lovell's motion to suppress.  Following the denial of his motion, Lovell entered conditional guilty pleas on all four counts pursuant to M.R.U. Crim. P. 11(a)(2).  On August 30, 2021, the court found Lovell guilty and sentenced him to six years, all but two suspended, and four years of probation on the Class A count,[2] with concurrent six-month sentences on the remaining three counts.

[¶7]   Lovell appealed, asserting that the court improperly allowed witnesses at the suppression hearing to testify about out-of-court statements made by the conductor to prove the truth of the matter asserted, and contending that Morrison lacked reasonable, articulable suspicion justifying Lovell's seizure.

---

[2]  A Class A aggravated trafficking charge ordinarily carries a mandatory minimum sentence of four years of imprisonment that may not be suspended.  17-A M.R.S. § 1125 (1)(A) (2022).  Here, the court stated on the record the necessary findings necessary under 17-A M.R.S. § 1125(2) to support imposition of less than the mandatory minimum term of unsuspended imprisonment.

## II. DISCUSSION

### A. The Conductor's Statements

#### 1. Hearsay

[¶8] "We review a trial court's decision to admit or exclude alleged hearsay evidence for an abuse of discretion." *State v. Vaughan,* 2009 ME 63, ¶ 5, 974 A.2d 930 (quotation marks omitted). The Maine Rules of Evidence apply to hearings on motions to suppress. *Id.*; M.R. Evid. 101(a)(b); M.R. Evid. 104 Restyling Note - Nov. 2014. "Hearsay is an out-of-court statement made by a declarant offered in evidence by a witness to prove the truth of the matter asserted." *Needham v. Needham,* 2022 ME 7, ¶ 11, 267 A.3d 1112 (citing M.R. Evid. 801). "[A] statement made by a person out of court is not hearsay if it is introduced as evidence of probable cause or an articulable suspicion and not for the truth of the matter asserted." *State v. Poole,* 551 A.2d 108, 110 (Me. 1988) (citing M.R. Evid. 104 Advisers' Note to former M.R. Evid. 104, Feb. 2, 1976); *see also State v. Johnson,* 2014 ME 83, ¶ 9, 95 A.3d 621; *Vaughan,* 2009 ME 63, ¶¶ 8-14, 974 A.2d 930. "In order to support a brief investigatory stop of a motor vehicle, such as the stop in this case, a police officer must have an objectively reasonable, articulable suspicion that either criminal conduct, a

civil violation, or a threat to public safety has occurred, is occurring, or is about to occur." *State v. Sylvain,* 2003 ME 5, ¶ 11, 814 A.2d 984 (footnote omitted).

[¶9]  Lovell contends that the conductor's out-of-court statements were hearsay because they were introduced to prove the truth of the matter asserted; namely, that Lovell and his companion were high on their return trip to Portland and that a crack pipe was found on their seat after they departed the train.  This argument misapprehends the motion court's analysis on a motion to suppress.  When reviewing a motion to suppress, the court first determines the factual underpinnings of the officer's suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur and the observations and information upon which the officer's suspicion are based.  *Id.*  The court then considers the purely legal question of whether, given its factual findings, the officer's suspicion was objectively reasonable as a matter of law.  *See State v. Sasso*, 2016 ME 95, ¶ 15, 143 A.3d 124; *State v. Simmons*, 2016 ME 49, ¶ 8, 135 A.3d 824; *Sylvain,* 2003 ME 5, ¶ 11, 814 A.2d 984.  Even if information provided to law enforcement is later determined to be incorrect, the ultimate truth of the information has no bearing on a reasonable suspicion analysis.  *See, e.g., Vaughan,* 2009 ME 63, ¶ 11, 974 A.2d 930.  Rather, the suppression court

considers the information known to the officer at the time of the seizure, the source of the officer's information, and all the circumstances under which the officer received the information to assess whether, based on the totality of the circumstances, the officer's suspicion was objective, articulable, and reasonable. *Id*.; *Sylvain,* 2003 ME 5, ¶¶ 11, 14, 814 A.2d 984.

[¶10]    Morrison's testimony about the conductor's out-of-court statements was offered to support the conclusion that he had an objectively reasonable belief under the totality of the circumstances that Lovell was engaging in criminal activity at the time he ordered the seizure. *See Vaughan,* 2009 ME 63, ¶ 14, 974 A.2d 930.  The conductor did not need to testify at the suppression hearing because "[t]he test is whether the information given [to Morrison] contain[ed] sufficient indicia of reliability, not whether it establishe[d] the truth of the[] particular facts." *State v. Peaslee,* 526 A.2d 1392, 1392 (Me. 1987).

[¶11]  We conclude that the information from the conductor presented sufficient indicia of reliability and that it was objectively reasonable for Morrison to rely upon the information from both the conductor and the detective to conclude that criminal activity was occurring.  Because "a statement made by a person out of court is not hearsay if it is introduced as

evidence of . . . an articulable suspicion," *Poole*, 551 A.2d at 110, the court did not err in concluding that the testimony regarding the conductor's statements was not hearsay.[3]  *See Vaughan,* 2009 ME 63, ¶ 14, 974 A.2d 930.

### 2.     Confrontation Clause

[¶12]   Lovell also contends that the admission of testimony from the detective and Morrison regarding information they received from the conductor violated Lovell's rights under the Confrontation Clause.  *See* U.S. Const. amend. VI; Me. Const. art. I, § 6.

[¶13]   The Sixth Amendment to the United States Constitution— including a defendant's right to be confronted with the witnesses against him— applies to the states through the Fourteenth Amendment.   U.S. Const. amend. VI; *Danforth v. Minnesota,* 552 U.S. 264, 270 (2008); *State v. Kimball,* 2015 ME 67, ¶ 15, 117 A.3d 585.  "The Confrontation Clause applies only to statements that are (1) hearsay and (2) testimonial." *Johnson,* 2014 ME 83, ¶ 9 & n.4, 95 A.3d 621.  "We review the application of the Confrontation Clause de novo." *Id.* ¶ 8.

---

[3] Lovell also argues that the conductor's out-of-court statements could, at most, be used only as evidence of Morrison's subjective reason for acting, but they were improperly used to prove the objective reliability required for a lawful seizure.  We are unpersuaded by this argument.

[¶14]   As previously discussed, testimony at the suppression hearing concerning the conductor's statements was not hearsay because the testimony was not offered to establish that Lovell made quick round trips between Portland and Haverhill, that he was high on a return trip, or that an alleged crack pipe was found near his seat.   Rather, the statements were offered to establish that Morrison had an articulable suspicion for stopping the vehicle in which Lovell was traveling.  *See id.* ¶¶ 8-9.  Because the Confrontation Clause does not apply to non-hearsay statements, we discern no constitutional violation.

## B.    Reasonable Articulable Suspicion

[¶15]   Lovell's central argument is that the suppression court erred in concluding that the officer had sufficient, particularized suspicion to seize him. As a subset of his argument, Lovell contends that behavior that is otherwise legal but consistent with a "drug courier profile" is insufficient to rise to the level of objectively reasonable, articulable suspicion.

[¶16]  "The Fourth Amendment to the United States Constitution protects citizens from unreasonable intrusions of police officers and other government agents."  *State v. Blier,* 2017 ME 103, ¶ 8, 162 A.3d 829 (citation and quotation

marks omitted).[4] As noted above, a police officer may lawfully stop, that is, "seize," a person only when the officer has an objectively reasonable, articulable suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur. *State v. Collier,* 2013 ME 44, ¶ 6, 66 A.3d 563; *Sylvain,* 2003 ME 5, ¶ 11, 814 A.2d 984. "The officer's suspicion that any of these circumstances exist must be objectively reasonable in the totality of the circumstances." *Sylvain,* 2003 ME 5, ¶ 11, 814 A.2d 984 (quotation marks omitted). "A seizure is unlawful if it is unreasonable." *State v. LaPlante,* 2011 ME 85, ¶ 8, 26 A.3d 337 (citations omitted).

[¶17] "[R]easonable articulable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence[] and need not rise to the level of probable cause[.] The suspicion need only be more than speculation or an unsubstantiated hunch." *State v. Laforge,* 2012 ME 65, ¶ 10, 43 A.3d 961 (citations and quotation marks omitted). "[A] tip—even an anonymous one— may be reliable if the information is corroborated by the officer." *Vaughan,* 2009 ME 63, ¶ 12, 974 A.2d 930. "[C]orroboration can consist of the officer

---

[4] Because Lovell's brief asserted and developed his reasonable, articulable suspicion claim based on the Constitution of the United States, not the Maine Constitution, we review his claim by applying federal law and principles. *See State v. Thomas*, 2022 ME 27, ¶ 13 n.3, 274 A.3d 356.

verifying details such as the physical description and location of the suspect" and does not require that an officer observe illegal behavior. *Id.* (quotation marks omitted). "[A] mere 'hunch' does not create reasonable suspicion." *Kansas v. Glover*, 589 U.S. \_\_, 140 S. Ct. 1183, 1187 (2020) (quotation marks omitted).

[¶18] "The denial of a motion to suppress is reviewed for clear error as to factual issues and de novo as to issues of law." *State v. Fleming,* 2020 ME 120, ¶ 25, 239 A.3d 648. "The nature of the detaining officer's [ ] suspicion and the nature of the observations upon which that suspicion is based are questions of fact. Whether an officer's suspicion is objectively reasonable is a pure question of law." *Sylvain,* 2003 ME 5, ¶ 11, 814 A.2d 984 (citation and quotation marks omitted). "We will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." *State v. Clark*, 2021 ME 12, ¶ 25, 246 A.3d 1165 (quotation marks omitted).

### 1. Drug Courier Profile

[¶19] A "drug courier profile" is a loosely defined set of otherwise innocuous behaviors that the Supreme Court has described as "an abstract of characteristics found to be typical of persons transporting illegal drugs." *Florida v. Royer,* 460 U.S. 491, 493 n.2 (1983); *see also Reid v. Georgia,*

448 U.S. 438, 440 (1980). Other courts have held that a drug courier profile may be used as a starting point for an investigation; however, consistency with a bare profile alone cannot amount to reasonable suspicion of illegal activity, because those who engage in the activities that the profile describes include large numbers of innocent people.[5] *See, e.g.*, *United States v. Sokolow,* 490 U.S. 1, 9-10 (1989); *United States v. Marrocco,* 578 F.3d 627, 633-634 (6th Cir. 2009); *United States v. Torres,* 949 F.2d 606, 608 (2nd Cir. 1991); *State v. Trainor,* 925 P.2d 818, 827 n.8 (Haw. 1996) (citing *Commonwealth v. Lewis,* 636 A.2d 619, 624 (Pa. 1994)).

[¶20] When law enforcement personnel are aware of characteristics or behaviors that fit a drug courier profile but that do not independently point to illegal behavior, our established case law treats that awareness as the equivalent of an "unsubstantiated hunch." In those instances, more is required for an officer to establish reasonable, articulable suspicion that a violation of

---

[5] We do not reach in this matter the question of whether a litany of strongly compelling evidence consisting only of factors that could fall within the category of "characteristics typical of persons transporting illegal drugs" is sufficient in the absence of other non-drug courier profile evidence of illegal activity to satisfy the requirement of reasonable, articulable suspicion. *See* Hon. Charles L. Becton, *The Drug Courier Profile: "All Seems Infected That Th' Infected Spy, As All Looks Yellow To The Jaundic'd Eye,"* 65 N.C.L. Rev. 417, 438-39 (1987). Nor do we define a list of what factors appropriately comprise a drug courier profile as each case will require a fact-driven analysis based on the totality of the circumstances. Additionally, were such a list provided, persons engaging in illegal drug trafficking would undoubtable simply modify their behavior to avoid suspicion. *See United States v. Sokolow*, 490 U.S. 1, 14 n.1 (1989) (Marshall, J., dissenting).

14

law has occurred, is occurring, or will occur. *See State v. Simons*, 2017 ME 180, ¶ 12, 169 A.3d 399; *Sasso*, 2016 ME 95, ¶¶ 7, 14, 143 A.3d 124; *State v Porter*, 2008 ME 175, ¶¶ 9, 11, 960 A.2d 321. The "more" that is needed is information that is "reliable in its assertion of illegality," *State v. Lafond*, 2002 ME 124, ¶ 10, 802 A.2d 425 (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000)), because "in making a determination of [reasonable, articulable suspicion] the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts," *Sokolow*, 490 U.S. at 10 (quotation marks omitted).

[¶21] Even when information that matches a suspect to a drug courier *profile* is corroborated by law enforcement officers—i.e., substantiated—that information serves only to confirm that the activities of a person fit the profile and does not provide the reliable "assertion of illegality" needed to raise the officer's hunch to the level of reasonable suspicion.[6] However, the threshold to establish reasonable suspicion is low, *Laforge*, 2012 ME 65, ¶ 10, 43 A.3d 961, and its inquiry "falls considerably short of 51% accuracy" because "to be

---

[6] Although corroborated information that bolsters the drug courier profile does not raise the profile from a hunch to a reasonable suspicion, corroboration provides greater weight to the information when examining the totality of the circumstances because "[a] court sitting to determine the existence of reasonable suspicion must require the [officer] to articulate the factors leading to that conclusion, but the fact that those factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by [the officer]." *Sokolow*, 490 U.S. at 10.

reasonable is not to be perfect," *Glover*, 589 U.S. ___, 140 S. Ct. at 1188 (alterations, citations, and quotation marks omitted). *See, e.g.*, *Simmons*, 2016 ME 49, ¶¶ 5-6, 9, 12, 135 A.3d 824 (warden's suspicion that a traffic infraction had occurred was objectively reasonable after witnessing a "wide right-hand turn"); *State v. Eklund*, 2000 ME 175, ¶¶ 2-3, 7, 760 A.2d 622 (officer's background knowledge coupled with his observation of the driver's gender, make and color of vehicle, and a bumper sticker for defendant's business were sufficient to justify an investigatory detention); *State v. Hill*, 606 A.2d 793, 795 (Me. 1992) (apparent absence of a rear license plate justified stop at its inception, even when the officer later realized that no such traffic infraction had occurred); *State v. D'Angelo*, 605 A.2d 68, 69-71 (Me. 1992) (valid stop occurred when a vehicle pulled into a driveway approximately seventy-five yards before a police checkpoint, the officer believed the vehicle did not belong at that address, and no passengers exited the vehicle within thirty seconds of parking).

### 2. Morrison's reasonable suspicion

[¶22]   "It cannot be denied that some profile characteristics, when properly applied, accurately predict criminality." Hon. Charles L. Becton, *The Drug Courier Profile: "All Seems Infected That Th' Infected Spy, As All Looks*

*Yellow To The Jaundic'd Eye,"* 65 N.C.L. Rev. 417, 470 (1987). But because of the inherent danger that arises from a profile born of malleable and often contradictory behaviors and characteristics, any case that employs a drug courier profile to establish reasonable suspicion will require a fact-intensive review. The reviewing court must exercise extreme caution in determining whether facts are suggestive of illegal drug activity in the particular circumstances—and how profile factors relate to the particular conduct of the suspect—to ensure factors are not used as an after-the-fact justification for a seizure. *Id.* at 429-30. The sheer number of often conflicting factors that courts across the country have held are indicative of drug courier activity emphasizes the unique inquiry each case will require. *See, e.g.*, *Sokolow*, 490 U.S. at 13-14 (Marshall, J., dissenting); Hon. Charles L. Becton, *supra* at 438-44.

[¶23] In the present matter, the court demonstrated such caution in its review. Its findings demonstrate the court carefully weighed the evidence presented, discounted certain facts, and relied on others that were both appropriately supported and suggestive of illegal drug activity. Additionally, in this case, although the officer's initial hunch was based on characteristics typical of both innocent travelers and those transporting illegal drugs, evidence was presented that Morrison's investigation developed "more" than merely

characteristics consistent with a profile. Once he was alerted to Lovell's travel practices, which were consistent with a person using the train to transport illegal drugs, Morrison learned from another agent within the MDEA that Lovell had previous involvement in drug incidents. He also determined from Lovell's license and bail conditions that Lovell's address was north of Portland. Morrison reasonably inferred that in order to complete a round trip to Haverhill, Lovell would need to find transportation to and from Portland, then ride the train for multiple hours, all for the purpose of disembarking in a known drug area for only thirty-eight minutes.[7] *See Glover*, 589 U.S. \_\_, 140 S. Ct. at 1188. On January 11, 2020, Morrison was informed about Lovell's scheduled trip with a short stop in Haverhill and was able to verify that Lovell did indeed complete his trip on that day by observing Lovell and a child departing the terminal area after the train from Haverhill arrived back in Portland.

[¶24] At the time he ordered the seizure, Morrison also knew that the conductor had reported that Lovell and his companion had appeared "high on some kind of drugs" on their return trip from Haverhill on December 23, 2019, and that what the conductor reported to be a "crack pipe" was found on their

---

[7] Morrison also knew that on January 11, 2022, Lovell was scheduled to make this multi-hour journey with a child.

seats after they departed the train.[8]  "[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' . . . remain 'highly relevant in determining the value of his report.'"  *Alabama v. White*, 496 U.S. 325, 328 (1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).  *See also Lafond*, 2002 ME 124, ¶ 9, 802 A.2d 425 ("When law enforcement assesses the reliability of a tip, due weight must be given to the informant's 'veracity' and 'basis of knowledge.'").

[¶25]  Thus, in the course of performing his regular job, the conductor provided information to the Amtrak detective that the detective was able to corroborate through Amtrak's internal system.  When viewed in the totality of the circumstances, the veracity, reliability, and basis of knowledge for the conductor's information had sufficient indicia of reliability which made it reasonable for Morrison to consider that information.  *See Navarette v. California*, 572 U.S. 393, 399, 404 (2014); *State v. Cushing*, 602 A.2d 1169, 1170 (Me. 1992).

[¶26]  These articulable facts and reasonable inferences built from the starting point of an appropriate "drug courier profile" established the "more"

---

[8] Although the court stated that it gave little weight to the conductor's report of the crackpipe in reaching its conclusion that reasonable, articulable suspicion existed, we review that conclusion de novo and independently weigh the import of the information known to the officer.  We find in this circumstance that the conductor's report was a valid and significant factor in Morrison's assessment that criminal conduct had taken place.  *State v. Diana*, 2014 ME 45, ¶¶ 13-14, 18, 20, 89 A.3d 132.

needed to raise Morrison's initial hunch to a reasonable, articulable suspicion that Lovell was engaged in illegal drug activity.[9] *See Simons*, 2017 ME 180, ¶ 12, 169 A.3d 399*.* We conclude that at the time Morrison ordered a stop of the vehicle Lovell was traveling in, he had a clearly articulated and objectively reasonable suspicion that Lovell was currently engaged in criminal activity. When viewed in the totality of the circumstances, the vehicle stop was constitutionally permissible, and the court properly denied Lovell's motion to suppress.

The entry is:

Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Joshua Lovell

Aaron Frey, Attorney General, and Johanna L. Gauvreau, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2020-191
FOR CLERK REFERENCE ONLY

---

[9] Although the specific facts of this case establish "more" beyond the drug courier profile's starting point, we emphasize that "because the mosaic which is analyzed for a reasonable suspicion or probable cause inquiry is multifaceted, one determination will seldom be a useful precedent for another." *Ornelas v. United States*, 517 U.S. 690, 698 (1996) (quotation marks omitted).