MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2025 ME 76
Docket:       Pen-24-303
Argued:       March 6, 2025
Decided:      August 19, 2025

Panel:        STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

## STATE OF MAINE

v.

## JOHN D. SCHLOSSER

CONNORS, J.

[¶1]  John D. Schlosser appeals from a judgment of conviction of various offenses, including drug trafficking, entered by the Superior Court (Penobscot County, *A. Murray, J.*) following a jury trial.[1]  The issues presented are whether the trial court erred by (1) denying Schlosser's motion to suppress evidence; (2) admitting the testimony of an expert witness; (3) declining to instruct the jury that unlawful possession was a lesser included offense of aggravated trafficking; and (4) treating the significant activity on Schlosser's cell phone

---

[1]  The counts tried were aggravated trafficking of scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(M) (2025) (Count 1); unlawful trafficking of scheduled drugs (Class B), 17-A M.R.S. § 1103(1-A)(A) (2025) (Count 2); violating a condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2025) (Count 3); and criminal forfeiture, 15 M.R.S. § 5826 (2023) (Count 4).  Because 15 M.R.S. § 5826 has since been amended, P.L. 2023, ch. 196, § 1 (effective Oct. 25, 2023) (codified at 15 M.R.S. § 5826 (2025)), we cite the statute in effect when the crime was committed.

The jury found Schlosser guilty on Counts 1 and 2.  Schlosser waived his right to a jury trial on Counts 3 and 4, and the court entered a finding of guilty on Count 3 and ordered forfeiture on Count 4.

2

throughout the search as an aggravating factor in its sentencing analysis. We affirm.

## I. BACKGROUND

### A. Stop and Search

[¶2] The following sets forth the factual findings of the suppression court (Penobscot County, *Roberts, J.*) supported by evidence presented at the suppression hearing.[2] *See State v. Barclift*, 2022 ME 50, ¶¶ 2, 9, 282 A.3d 607 (stating that the denial of a motion to suppress is reviewed based on the competent evidence in the suppression record); *State v. Smith*, 2004 ME 148, ¶ 2, 866 A.2d 85 ("Where the sufficiency of the evidence to support trial court fact-findings on a motion to suppress is challenged, we state the evidence that appears in the record from the perspective most favorable to those findings.")

[¶3] An officer of the Bangor Police Department was on duty in a marked police cruiser on May 27, 2023. Around nine o'clock in the morning, the officer traveled near the back of several businesses; the area behind those businesses contains a drive leading to loading bays and dumpsters, and the drive is clearly marked with no-trespassing signs. The officer was aware that the businesses,

---

[2] Schlosser filed a motion to suppress in August 2023 and an amended motion about one month later. He filed a supplemental motion to suppress in December 2023, and the court held a hearing the following January. After the court denied the motion, Schlosser filed a motion to reconsider and request for further findings of fact, which the court summarily denied.

as well as local residents, had complained of illicit drug activities in the area of the drive, and the officer had himself found individuals using illicit drugs there. The officer observed Schlosser near the lower end of the drive walking toward the street and testified that when Schlosser saw the cruiser, he "act[ed] very suspicious," "started fumbling with something," and began "quickly walk[ing]" away. The officer called to Schlosser from his cruiser as he approached the drive, but Schlosser did not respond. The officer pulled into the end of the drive, and Schlosser initially reacted by walking away from the cruiser. As the officer exited his cruiser, he again called out and told Schlosser to come over to him. Schlosser responded to the officer's second call, and upon approaching the officer, he appeared to be attempting to conceal something in his pocket. When asked, Schlosser identified himself to the officer. The officer recognized Schlosser as someone whom he had observed in the vicinity of "drug houses" in the Bangor area.[3] Dispatchers informed the officer that Schlosser was subject to bail conditions requiring him to submit to the search of his person based on articulable suspicion of the use or possession of illegal drugs. The officer searched Schlosser and found fentanyl and cocaine.

---

[3] The officer defined a "drug house" "as an area where people . . . us[e] drugs inside the house and squat[]."

4

[¶4]  Based on these findings of fact, the court denied Schlosser's motion to suppress, concluding:

> Here, [the officer] observed an individual trespassing in an area frequented by drug users.  Schlosser's unauthorized presence in an area posted against trespassers was sufficient basis for [the officer's] stop.  His furtive behavior in that area and observed presence previously in areas frequented by drug users[] support[] the officer's articulated suspicion that he was in possession of illicit drugs.  That same reasonable suspicion justified [the officer's] subsequent search of [Schlosser's] person for illegal drugs.

## B.  Discovery Dispute

[¶5]  Approximately two months before trial, in late March 2024, the State shared with the defense its first witness list, which included a Maine Drug Enforcement Agency (MDEA) commander.  On May 15, five days after the jury had been selected, Schlosser filed a motion in limine asking the court to "preclude[] the State from calling [the MDEA commander] as a witness," arguing that the commander "either does not meet the threshold elements to be a lay witness or is an expert witness that the State has declined to designate as one."  According to the defense's motion, Schlosser had requested discovery materials pertinent to the MDEA commander about one month after Schlosser received the State's witness list, and the State had responded that it would be calling the commander as a lay opinion witness.  The defense claimed that it did not learn the contents of the MDEA commander's testimony until sometime in

April and that "the State's decision to not provide an expert report did not become final until jury selection," which took place on May 10.

[¶6] During an in-chambers conference before the start of the trial, the court denied the defense's motion in part and granted it in part. The court concluded, contrary to the State's position, that the testimony that the State planned to elicit from the MDEA commander "d[id] require expert testimony"; it also determined, however, that while the State had engaged in "sharp practice," it had not committed a discovery violation because, pursuant to M.R.U. Crim P. 16(d)(4), the State had no obligation to share an expert report where none existed and where the defense had not filed a motion seeking a court order directing the State to produce such a report. The court offered to give the defense a continuance and to require the State to produce an expert report. The defense declined the continuance, opting to proceed with the trial.

**C.** **Trial**

[¶7] The court held a jury trial on May 20 and 21, 2024. The State presented its case through five witnesses; Schlosser was the only witness for the defense.

### 1. The Arresting Officer's Testimony

[¶8] In addition to testifying consistently with his suppression hearing testimony regarding the initial stop and the discovery of drugs on Schlosser's person,[4] the arresting officer discussed his background and experience, explaining that he had been a police officer for over ten years and that he had trained "quite extensively in drug interdiction."[5]

[¶9] The court then allowed the State to ask the officer some questions about the drugs uncovered during the search, and the officer testified that drugs are typically priced and sold by specific weights. He explained that the two tied-off bags that he found on Schlosser's person, as opposed to the nine small zip-closed "ticket bags" also found during the search, contained "larger" amounts rather than measured portions of drugs. The officer stated that bags containing larger amounts generally are weighed and parceled out into smaller "ticket bags" for resale and that the nine smaller bags appeared to be measured out for resale.

[¶10] The officer also testified that during the search, "[Schlosser's] phone kept ringing over and over and over and over." When the State asked

---

[4] The officer also testified that he found a scale disguised as a cigarette pack on Schlosser's person.

[5] The court admitted video footage from the officer's bodycam and cruiser as exhibits.

the officer whether he saw the name of the person calling, he responded, "It's from different . . . it didn't have a person name. It was like [a] street name. Like one of them was . . . a car name. So it didn't have any person name; it's like different . . . strange . . . names coming up on the phone."

### 2. The Chemist's Testimony

[¶11]  The State's chemist testified as an expert in drug analysis of samples of unknown seized drugs, and he reported that, based on tests conducted by his lab, Schlosser was carrying, in total, over forty-two grams of fentanyl and over six grams of cocaine base.

### 3. The MDEA Commander's Testimony

[¶12]  When the State called the MDEA commander, Schlosser renewed his objection to the commander's testimony, *see supra* ¶¶ 5-6, arguing that "[w]ithout an expert witness report, [his] cross-examination . . . [was] not going to be as effective." The court reiterated its position that the MDEA commander "is somewhat offering in the nature of expert testimony" but added that the scope of his testimony would be limited to "the price of fentanyl and the price of heroin in this community in the time frame in question" and that the court was "satisfied that this [was] not a complicated concept."

[¶13] The MDEA commander's testimony on direct was brief. He first testified about his expertise, explaining that he had been a police officer for twenty-two years and that he was currently assigned as the commander of the northern division of the MDEA. He explained that in his fourteen years with the MDEA,[6] he regularly interacted with both drug users and drug traffickers, and he frequently supervised undercover purchases of drugs. The commander testified that he was familiar with the prices of cocaine, fentanyl, and fentanyl/heroin blend in the greater Bangor area in mid-2023, and that the average price for a gram of cocaine at that time was $100 and the value of one gram of fentanyl or fentanyl/heroin was $150 to $180.

[¶14] On cross-examination, which was also brief, the MDEA commander agreed that he was just speaking generally and that he had not been involved in Schlosser's case; that sometimes someone would buy more than a gram; and that if someone bought a larger quantity of drugs, the price per gram would go down some amount depending on multiple factors.

### 4. Schlosser's Testimony

[¶15] Schlosser testified that he had struggled with substance abuse for several years and that all the drugs found on his person were for his own use.

---

[6] The MDEA commander testified that he had been with the MDEA "on and off for 14 years."

On cross-examination, Schlosser stated that he was not working at the time of his arrest; that he had not been working for the last four months; and that he used large quantities of fentanyl and cocaine, purchasing these drugs at prices that varied.

### 5.    The Jury Instructions

[¶16]   The defense requested that the court instruct the jury that unlawful possession was a lesser included offense of trafficking, arguing, "In this case . . . there's just no evidence . . . to support any other definition of traffick besides possession with intent."  The State "consent[ed] to possession being given as a lesser to Count II on the cocaine," but not on Count 1, "the fentanyl count."[7]  Following a discussion of precedent, *see State v. Hardy*, 651 A.2d 322, 325 (Me. 1994); *State v. Osborn*, 2023 ME 19, ¶ 14 n.7, 290 A.3d 558, the court concluded that possession was not a lesser included offense of trafficking and declined to give an unlawful possession instruction on Count 1. Given the State's concession on Count 2, the court agreed to give the lesser included offense instruction on that count.

[¶17]   As to Count 1, the court instructed the jury on both aggravated trafficking of scheduled drugs and trafficking of scheduled drugs.  The court

---

[7]  During the officer's search of Schlosser's person, the officer found a much larger quantity of fentanyl (about forty-two grams) than cocaine (about six grams of cocaine base).

defined "traffick" as follows: "Under Maine law[,] traffick in the context of this case means to possess with the intent to sell, barter, trade, exchange or otherwise furnish for consideration."

**D.    Sentencing**

[¶18]  After the jury returned a guilty verdict on Counts 1 and 2 and the court entered a finding of guilty on Count 3 and ordered forfeiture on Count 4, the court entered judgment and held a sentencing hearing in June 2024.

[¶19]  At step one of the three-step sentencing analysis, in which a court identifies the basic term of imprisonment by considering the nature and seriousness of the offense, *see* 17-A M.R.S. § 1602(1)(A) (2025); *State v. Hewey*, 622 A.2d 1151, 1154-55 (Me. 1993), the sentencing court observed, inter alia, that "[t]here w[ere] a lot of drugs involved," there "was also packaging and so forth," and the jury had determined that Schlosser was guilty of aggravated trafficking.

[¶20]   At step two, in which a court sets the maximum term of imprisonment by "considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case," *see* 17-A M.R.S. § 1602(1)(B) (2025), the court noted as an aggravating factor that "Schlosser's cell phone was very active" throughout the search.

[¶21] After determining at step three of its *Hewey* analysis that a portion of the term of imprisonment should be suspended, *see* 17-A M.R.S. § 1602(1)(C) (2025), the court set the final sentence as to Count 1, aggravated trafficking of fentanyl, at seven years of incarceration with all but four years suspended and a $400 fine. On Count 2, unlawful trafficking of cocaine, the court set a sentence of four years, concurrent with Count 1, and a $400 fine. On Count 3, violating a condition of release, the court set a sentence of thirty days, concurrent with Counts 1 and 2, and the court ordered forfeiture on Count 4.

## E. Appeal

[¶22] Schlosser timely appealed the conviction and applied to this Court to allow an appeal of his sentence. M.R. App. P. 2B(b)(1); M.R. App. P. 20; 15 M.R.S. § 2151 (2025). The Sentence Review Panel granted Schlosser's leave to appeal the sentence, and the appeals were merged pursuant to M.R. App. P. 20(h).

## II. DISCUSSION

### A. The court did not err or abuse its discretion in denying Schlosser's motion to suppress.

[¶23] Acknowledging that he was "subject to a bail condition requiring that he submit to searches upon articulable suspicion for illegal drugs," Schlosser argues that the motion to suppress should have been granted because

the arresting officer "lacked reasonable suspicion to seize Schlosser for criminal trespass, or [for] any other crime[,]" and lacked articulable suspicion that Schlosser possessed illegal drugs at the time of the search. More specifically, Schlosser argues (A) that this Court "should disregard the trial court's reliance on Schlosser's 'furtive' behavior," because that term "carries no factual or legal significance" and because "there was no 'furtive' conduct" here; (B) that "there was no evidence" that Schlosser "was in fact trespassing" when he was stopped; (C) that "the evidence . . . showed that Schlosser was not in the area [where] [the officer] had seen prior drug activity"; (D) that "[t]he legal significance of prior complaints of drug activity by the dumpsters is limited"; and (E) that Schlosser's association with drug dealers "did not support the . . . specific suspicion . . . that Schlosser in fact possessed drugs when [the officer] seized him".

[¶24] "The denial of a motion to suppress is reviewed for clear error as to factual issues and de novo as to issues of law. The nature of the detaining officer's suspicion and the nature of the observations upon which that suspicion is based are questions of fact. Whether an officer's suspicion is objectively reasonable is a pure question of law." *State v. Lovell*, 2022 ME 49, ¶ 18, 281 A.3d 651 (citation, alteration, and quotation marks omitted).

[¶25]   Under the Fourth Amendment, investigatory stops must be supported by reasonable, articulable suspicion that the individual is engaged in criminal activity.[8]  *See Terry v. Ohio*, 392 U.S. 1, 21 (1968); *State v. Fillion*, 474 A.2d 187, 189 (Me. 1984).  To justify a *Terry* stop, an "officer's objective observations, coupled with any relevant information he may have, together with the rational inferences and deductions he may draw and make from the totality of the circumstances, [must] be sufficient to reasonably warrant suspicion" that the party or parties being stopped or detained have engaged in, are engaging in, or are imminently about to engage in criminal conduct.  *State v. Griffin*, 459 A.2d 1086, 1089 (Me. 1983) (quotation marks omitted); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.").

[¶26]   First, regarding the initial stop, the court's factual findings were supported by the evidence presented at the suppression hearing, and they

---

[8]  Schlosser does not cite the Maine Constitution in his briefing to us.  Before the trial court, he cited article 1, § 5 of the Maine Constitution in passing.  Neither in the trial court proceedings nor before us has he developed an argument under the Maine Constitution; hence, we review his claim only under the federal provision.  *See State v. Norris*, 2023 ME 60, ¶ 33, 302 A.3d 1.

justified the conclusion that the arresting officer had reasonable suspicion that Schlosser was trespassing. *See supra* ¶ 3. Multiple signs prohibiting trespassing were posted; the businesses in the vicinity had informed the officer that they did not want people in the location where Schlosser was found; and trespassing had occurred in that location in the past. *See* 17-A M.R.S. § 402(4) (2025) (listing the forms of criminal trespass); *State v. Fitzgerald*, 620 A.2d 874, 875 (Me. 1993) (affirming that an officer had reasonable suspicion to support a *Terry* stop "based on the previous littering and trespassing that had occurred on the private property in question" and the defendant's attempt to leave the area upon seeing the officer's cruiser approach).

[¶27] Second, regarding the search of Schlosser's person, the court's factual findings were also supported by evidence presented at the suppression hearing and justified the conclusion that the arresting officer had reasonable suspicion of drug use or possession. Although Schlosser takes exception to the court's description of his conduct as "furtive," the arresting officer described Schlosser's conduct upon seeing the cruiser as "suspicious," explaining that Schlosser had "tried to do something with his hands" and looked like he was trying to walk away. *See United States v. Soares*, 521 F.3d 117, 118 (1st Cir. 2008) (concluding that officers had reasonable suspicion to conduct a pat-frisk

of the passenger of a car stopped for a traffic violation based on several factors, including that the passenger "furtive[ly]" "ben[t] over toward [his] left, as if putting something on the floor [of the car]" before the vehicle stopped); *United States v. Moustrouphis*, 560 F. Supp. 3d 333, 346 (D. Me. 2021) (holding that officers had reasonable suspicion to conduct a stop based on several factors, including that "as [the officers] were following [the defendant], they saw him glancing over his shoulder and making 'furtive movements' with his right hand like he was trying to manipulate something behind him"); *Griffin*, 459 A.2d at 1090 (concluding that an officer had reasonable suspicion to conduct a *Terry* stop of the defendant's vehicle based solely on his "furtive behavior consisting of his sliding from the driver's seat to the rear seat of the recently-stopped automobile immediately on realizing that he was being observed by a law enforcement officer in uniform in a marked patrol car").

[¶28]  In addition, the officer recognized Schlosser, having seen him on multiple occasions driving to and from different drug houses, and the location where Schlosser was found was a known site of drug activity.  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis."); *Moustrouphis*, 560 F. Supp. 3d at 345 ("Presence in a high crime area

plus unprovoked flight upon noticing police can be enough to trigger reasonable suspicion."); *State v. Dean*, 645 A.2d 634, 636 (Me. 1994) (stating that a defendant's "presence in an area of recent crime reports" and "the apparent absence of any reason to be in an uninhabited area at night" together create reasonable suspicion).

[¶29]  In sum, the court neither erred nor abused its discretion in denying Schlosser's motion to suppress.  *See Lovell*, 2022 ME 49, ¶ 18, 281 A.3d 651.

## B.    The court did not abuse its discretion in allowing the testimony of the MDEA commander.

[¶30]  Schlosser contends that the court erred by failing to exclude the MDEA commander as a witness and that this error "was substantively prejudicial" because it "undermined . . . Schlosser's defense that the drugs he possessed were for personal use only."  Noting that his case had been pending for almost one year and that he had repeatedly requested a speedy trial, Schlosser also challenges the court's offered remedy of a continuance, arguing, "Requiring that Schlosser give up his trial date . . . because the State chose to wait until the home stretch of the case to decide that it needed an expert would be fundamentally unfair, and [it would] undermine Schlosser's speedy trial rights."

[¶31]  Here, the court astutely identified two relevant issues: first, it can be difficult to identify when police testimony crosses the line separating lay testimony from expert testimony, *see State v. Abdullahi*, 2023 ME 41, ¶¶ 24, 31, 298 A.3d 815, and second, actions like the State's here, although not violative of the discovery rules, can nonetheless constitute sharp practice, *see State v. Dennis*, 2024 ME 54, ¶ 18 n.9, 320 A.3d 396.

[¶32]  Even when the State does violate the discovery rules, which it did not here, "[w]e afford the trial court substantial deference in overseeing the parties' discovery, and [we] review its decisions on alleged discovery violations only for an abuse of discretion." *State v. Silva*, 2012 ME 120, ¶ 8, 56 A.3d 1230. "For a jury verdict to be overturned on appeal based on an alleged discovery violation, the alleged violation must have prejudiced the defendant to the extent that it deprived her of a fair trial." *State v. Dolloff*, 2012 ME 130, ¶ 24, 58 A.3d 1032.  This standard sets a high bar for defendants on appeal.  *See State v. Reeves*, 499 A.2d 130, 133 (Me. 1985) ("To establish an abuse of discretion under [M.R.U. Crim. P. 16(d)] is a difficult task.  To do so, an appellant must show that he was in fact prejudiced by the discovery violation despite the court's effort to nullify or minimize its consequences.").

[¶33] The court here dealt with the situation presented to it commendably. It correctly identified the officer's testimony as expert testimony. *See Abdullahi*, 2023 ME 41, ¶ 31, 298 A.3d 815 ("In the case of police testimony, it is important that officers be designated as experts when they are expected to offer opinions based on their 'knowledge, skill, experience, training, or education' that is beyond the comprehension of an ordinary person." (citing M.R. Evid. 702)). The court also identified the limited subject matter on which the MDEA commander could testify, and the court offered to give Schlosser a continuance and to order the State to prepare a report.

[¶34] We understand defendants' frustration when faced with the unpalatable choice of going forward to trial without an expert report or extending the time until trial to receive a report from the State. But at least in the instant context, in the absence of a finding of bad faith on the part of the State and where the expert's testimony was straightforward enough that any delay required to prepare a report and to digest it could have been short, the court acted well within its discretion in admitting the testimony and in offering the defense a continuance. *See Dennis*, 2024 ME 54, ¶¶ 18, 26, 320 A.3d 396.

**C.     Even if it were error not to instruct the jury that possession was a lesser included offense of trafficking as to Count 1, that error was harmless.**

[¶35]   Schlosser argues that the trial court erred in refusing to instruct the jury on Count 1 that possession of scheduled drugs was a lesser included offense of aggravated trafficking.  *See* 17-A M.R.S. § 13-A(1) (2025).  He contends that he was entitled to a lesser included offense instruction because, although "traffick" has several statutory definitions,[9] the court defined "traffick" narrowly in its jury instructions, stating that "[u]nder Maine law traffick in the context of this case means to possess with the intent to sell, barter, trade, exchange or otherwise furnish for consideration."

[¶36]   Title 17-A M.R.S. § 13-A(2)(A) (2025) defines a lesser included offense as an offense carrying a lesser penalty which "[*a*]*s legally defined* must necessarily be committed when the offense or alternative thereof actually charged, *as legally defined*, is committed" (emphasis added).  In *Hardy*, 651 A.2d at 325, relying on this language, we held that unlawful possession of scheduled

---

[9]  Title 17-A M.R.S. § 1101(17)(A)-(D) (2025) establishes the following definition of "[t]raffick":

**A.**  To make, create, manufacture;
**B.**  To grow or cultivate, except for marijuana;
**C.**  To sell, barter, trade, exchange or otherwise furnish for consideration; or
**D.**  To possess with the intent to do any act mentioned in paragraph C.

drugs is not a lesser included offense of unlawful trafficking "because one need not 'possess' marijuana in order to 'traffick' in marijuana."

[¶37]  But here, the full statutory definition of trafficking was not given to the jury; instead, the parties agreed to a definition that included only one method of trafficking: possession with intent to sell.  Because the jury was given only that narrow definition of trafficking in its instructions, the only way that it could find Schlosser guilty of trafficking was by finding that he had possessed illegal drugs with intent to sell.

[¶38]  We decline Schlosser's invitation to re-examine the meaning of "as legally defined" here, however, because even if it were error not to give the lesser included offense instruction, we deem that error harmless.  *See* 17-A M.R.S. § 13-A(2)(A); *State v. Garcia*, 2014 ME 150, ¶ 16, 106 A.3d 1137 (stating that an error in instructions is harmless if a review of the entire trial record demonstrates that it is highly probable that the error did not affect the jury's verdict).

[¶39]  Schlosser had over forty-two grams of fentanyl on his person, well above the six grams required for an aggravated trafficking conviction, 17-A M.R.S. § 1105-A(1)(M) (2025), as well as the four grams required to support an inference of unlawful trafficking, 17-A M.R.S. § 1103(3)(C-2) (2025).

He carried the drugs both in large bags and separate smaller bags, both filled and empty, along with a large amount of cash and a scale disguised as a cigarette pack.

[¶40]  In addition, the court correctly instructed the jury that under Maine law, "proof that a person intentionally or knowingly possessed fentanyl powder in an amount of four grams or more gives rise to a permissible inference that the person was . . . unlawfully trafficking in fentanyl powder." *See* 17-A M.R.S. § 1103(3)(C-2).  A note submitted to the court from the jury during its deliberations suggested that it relied on this permissive inference in finding Schlosser guilty of trafficking on Count 1.[10]

[¶41]  The fact that the jury returned a guilty verdict on Count 2 for cocaine trafficking also supports the conclusion that if any error occurred, it was harmless.  By agreement, the jury received a lesser included offense instruction on unlawful possession as to the cocaine charge and heard testimony that Schlosser had had about six grams of cocaine on his person. Given that the jury found Schlosser guilty of unlawful trafficking of cocaine even when the amount of cocaine found on his person did not generate an instruction

---

[10]  The note stated, consistent with the jury instructions, that there was a presumption for trafficking based on amount as to fentanyl and asked whether there was a similar presumption for cocaine.

permitting a permissive inference of trafficking, *see* 17-A M.R.S. § 1103(3)(B) (2025), the chances that that the jury would not have found trafficking on the fentanyl charge, Count 1, had it been given a lesser included offense instruction are extremely remote.

**D.    The court did not err in sentencing.**

[¶42]   In challenging his sentence, Schlosser focuses on the court's observation at step two of its *Hewey* analysis that Schlosser's cell phone was constantly ringing throughout the stop.   *See* 17-A M.R.S. § 1602(1)(B). Schlosser argues that the court's reliance on this fact was incorrect for two reasons: first, it "impermissibly double-counted the scope of Schlosser's drug trafficking activity" by considering it at both step one and step two of the *Hewey* analysis; and second, "it was unduly speculative for the trial court to assume that all the cell phone activity . . . must have been trafficking-related."

**1.    The court did not double count.**

[¶43]   We review a double-counting claim de novo.  *State v. Plummer*, 2020 ME 143, ¶ 11, 243 A.3d 1184.

[¶44]   Schlosser argues that the court impermissibly weighed the scope of his trafficking at both step one and step two of its sentencing analysis.  *See* 17-A M.R.S. § 1602(1)(A)-(B).  But "[i]t is not an abuse of discretion for a court

to refer to the same facts in the various steps of the sentencing analysis so long as the court is weighing different considerations at each step." *State v. Gray*, 2006 ME 29, ¶ 13, 893 A.2d 611 (quotation marks omitted); *see Plummer*, 2020 ME 143, ¶¶ 3-4, 14, 243 A.3d 1184 (affirming the sentence where the court counted the "large" "quantity of drugs" and "large sum of money" involved in the case at step one and counted the defendant's "commercial motive" as an aggravating factor at step two, explaining that "the same *fact* can generate multiple *factors*" and that "[a] sentencing court may consider the same facts at steps one and two of its sentencing analysis, provided that it does so for different purposes").

[¶45]  At step one, the court looks at the nature of the crime, while at step two, the court focuses on the defendant.  *See Plummer*, 2020 ME 143, ¶ 13, 243 A.3d 1184 ("In step one, the court reviews factors relevant to the objective nature of the crime, while at the second step, it considers factors peculiar to the individual offender." (alteration and quotation marks omitted)).

[¶46]  Here, at step one, the court focused on the large quantity of drugs involved in this trafficking crime, i.e., the size of the operation.  In contrast, at stage two, the court focused on Schlosser himself and his individual role in that operation.  The activity on Schlosser's cell phone relates to his degree of

personal participation; thus, the court's consideration of this factor at step two does not constitute double counting.[11] *See Plummer*, 2020 ME 143, ¶ 15, 243 A.3d 1184 (explaining that the sentencing court did not double count because while the court alluded to the commercial nature of the criminal operation at both the first and second steps, the court "assessed the facts relating to those commercial operations for different reasons at each step").

>    **2.    It was reasonable for the court to weigh the degree of activity on Schlosser's cell phone.**

[¶47]   A defendant has a due process right to be sentenced based on reliable information.  *See State v. King*, 1998 ME 60, ¶ 16, 708 A.2d 1014 ("In applying the *Hewey* principles, the court can rely on any factually reliable evidence."); *United States v. Halliday*, 672 F.3d 462, 475 (7th Cir. 2012) ("Sentencing judges have discretion to draw conclusions about the testimony given and evidence introduced at sentencing, but cannot base sentencing determinations on speculation or unfounded allegations." (quotation marks omitted)).

---

[11] We also note that if the scope of Schlosser's role in the trafficking operation as reflected by the large number of calls he received had been weighed at step one in setting his basic sentence instead of at step two, it likely would have had an adverse impact on the ultimate sentence, and thus, Schlosser was not prejudiced by the court's decision to weigh that factor at step two. *See Desmond v. Desmond*, 2012 ME 77, ¶ 19, 45 A.3d 701 ("[T]o be successful on appeal, an appellant must not only demonstrate error, the appellant must show prejudice caused by the error." (quotation marks omitted)).

[¶48] It was within the discretion of the sentencing judge to consider, when weighing as an aggravating factor the degree of Schlosser's role in drug trafficking, the evidence that he was receiving many incoming calls from different and unusual names while in a location known for drug activity and carrying a large amount of drugs on his person.

The entry is:

Judgment affirmed.

---

Tyler J. Smith, Esq. (orally), Libby O'Brien Kingsley & Champion, LLC, Kennebunk, for appellant John D. Schlosser

Aaron M. Frey, Attorney General, and Jason Horn, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2023-1531
FOR CLERK REFERENCE ONLY